IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

_____
                                    )
CAMERON RAYMOND,                    )
                                    )
                  Plaintiff,        )
v.                                  )  Civ. No. 15-00212 ACK-RLP
                                    )
WILCOX MEMORIAL HOSPITAL,           )
                                    )
                  Defendant.        )
_____)


ORDER DENYING DEFENDANT WILCOX MEMORIAL HOSPITAL'S MOTION FOR

JUDGMENT AS A MATTER OF LAW

          For the reasons detailed below, the Court DENIES

Defendant Wilcox Memorial Hospital's Motion for Judgment as a

Matter of Law, ECF No. 444.

PROCEDURAL BACKGROUND

          On June 5, 2015, Plaintiff Cameron Raymond

("Plaintiff") filed a ten-count Complaint against nine named

defendants and numerous Doe defendants.  Compl., ECF No. 1.

Following the voluntary dismissal of two defendants,[1/] a

_____

[1/] Plaintiff voluntarily dismissed defendants Thomas Hemingway
and Dallen Johns on October 6, 2015.  ECF No. 7.

1

stipulation,[2/] the disposition of four motions by defendants,[3/] the death of one defendant,[4/] and a settlement,[5/] Defendant Wilcox Memorial Hospital ("Defendant"[6/]) was the only remaining

---

[2/] Plaintiff, defendant County of Kaua`i, and defendant Wilcox Memorial Hospital stipulated on June 16, 2017, that the claims Plaintiff had asserted against "County of Kaua`i, Kauai Police Department," see generally Compl., were against the County of Kaua`i and not the Kaua`i Police Department. ECF No. 163.

[3/] In its June 26, 2017 Order (1) Granting in Part and Denying in Part Defendant County of Kaua`i's Motion for Judgment on the Pleadings or Alternatively Summary Judgment to Which Defendants Perry, Sarsona, Kim, and Wakumoto Have Filed a Joinder and (2) Granting in Part and Denying in Part Defendant Wilcox Memorial Hospital's Motion for Summary Judgment ("June 26, 2017 Order"), ECF No. 164, the Court dismissed Plaintiff's claims against the Doe defendants without prejudice, id. at 16–17, 56. Defendant County of Kaua`i filed a motion to dismiss with prejudice all claims that the June 26, 2017 Order had dismissed without prejudice. ECF No. 168. The Court, in granting that motion, also dismissed with prejudice Plaintiff's claims against the Doe defendants. ECF No. 173. In August 2018, due to the parties' evident uncertainty regarding which claims remained, the Court issued two minute orders clarifying its June 26, 2017 Order. ECF Nos. 244, 302.

[4/] On November 9, 2017, counsel for defendant Jerald Kim filed a suggestion of death indicating that his client had passed away in October 2016. ECF No. 187. The Court dismissed Plaintiff's claims against Jerald Kim on August 18, 2018. ECF No. 244.

[5/] Plaintiff reached a settlement with defendants County of Kaua`i, Darryl D. Perry, Isaiah Sarsona, and Sandy Wakumoto, see ECF No. 314-1 at 1, and on October 23, 2018, those defendants filed a motion for determination of good faith settlement, ECF No. 314. On November 30, 2018, Magistrate Judge Puglisi issued his findings and recommendation that the motion be granted. ECF No. 321. The Court adopted the Magistrate Judge's findings and recommendation on December 21, 2018, ECF No. 328, and the relevant defendants were dismissed with prejudice on January 3, 2019, ECF No. 331.

[6/] Wilcox Memorial Hospital is referred to herein as "Defendant" when the discussion pertains to the entity that is a defendant in this action, but as "Wilcox Memorial Hospital" when necessary to refer to the hospital as a location.

defendant, and Plaintiff's claims of assault, battery, and

intentional infliction of emotional distress ("IIED") the only

remaining claims.[7] [8] Plaintiff's claims arose out of events that

---

[7] Plaintiff originally asserted, in addition, claims arising
under § 1983, as well as claims of negligence, false
imprisonment, medical negligence, and negligent infliction of
emotional distress ("NIED") against Defendant. <u>See generally</u>
Compl. In its June 26, 2017 Order, the Court granted
Defendant's motion for summary judgment as to all of these
claims, but denied Defendant's motion as to Plaintiff's claims
for assault, battery, and IIED. June 26, 2017 Order at 42-55.
[8] The Court had original jurisdiction over this matter due to
Plaintiff's assertion of federal claims, 28 U.S.C. § 1331; <u>see</u>
Compl. ¶¶ 111-27 (asserting claims under 42 U.S.C. § 1983), and
to the fact that his other claims were "so related . . . that
they form[ed] part of the same case or controversy[,]" 28 U.S.C.
§ 1367(a). Although the June 26, 2017 Order disposed of a
number of Plaintiff's claims, a § 1983 claim against a now-
dismissed defendant survived. June 26, 2017 Order at 21-23.
        Trial in this matter was scheduled to commence on
August 28, 2018. Amended Rule 16 Scheduling Order, ECF No. 184
¶ 1. The parties and the Court expended a great deal of time
and effort on trial preparation, and the parties made a number
of pretrial filings, <u>see, e.g.</u>, ECF Nos. 211-39, 245-300, but
the trial was continued on the motion of now-dismissed
defendants, <u>see</u> ECF No. 305. As iterated above, those
defendants reached a settlement with Plaintiff in October 2018,
<u>see</u> ECF No. 314, and, in January 2019, were dismissed from this
action with prejudice, ECF No. 331, along with the only
remaining federal claim.
        The Court, having considered the factors of judicial
economy, convenience, fairness, and comity, exercised its
discretion to retain jurisdiction over the remaining state-law
claims. <u>See</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350
n.7 (1988); <u>see also</u> <u>Acri v. Varian Associates, Inc.</u>, 114 F.3d
999, 1000 (9th Cir. 1997). Although comity considerations would
always seem to disfavor the continued exercise of jurisdiction
where federal-law claims are eliminated before trial, and
although convenience here was neutral, considerations of
judicial economy and fairness weighed heavily in favor of the
Court's retention of jurisdiction. The Court had already
(Continued . . .)

took place on June 5 and 6, 2013.  <u>See</u> Compl. ¶ 29.  Plaintiff

alleged that, following his detention by Kaua`i Police

Department officers and involuntary transportation to Wilcox

Memorial Hospital, <u>see id.</u> ¶ 45, 50, he was injected with Geodon

and haloperidol decanoate ("Haldol") against his will, <u>id.</u> ¶¶

72-78, and suffered a number of ill effects, <u>id.</u> ¶¶ 79-80, 94,

97-103, 110.

Following jury selection on March 12, 2019, ECF No.

436, jury trial in this matter took place on March 13-15 and 20-

21, 2019, ECF Nos. 437, 438, 440, 455, 456.  On March 18, 2019,

Defendant filed a Motion for Judgment as a Matter of Law

("Motion"), ECF No. 444, as well as a memorandum in support

("Mem. in Supp."), ECF No. 444-1, to which Plaintiff filed an

Opposition the following day, ECF No. 453.  The Court heard oral

argument on the Motion on March 20, 2019, ECF No. 455, but

---

(. . .)
expended significant time and resources on this matter by the
time all federal claims were eliminated, and to decline to
exercise jurisdiction upon the dismissal of the remaining
federal claim—i.e., little more than two months prior to trial—
would have been exceedingly wasteful, both of this Court's
already-expended resources and of the resources of the state
court to which the parties would then have been obligated to
proceed.  Moreover, to compel the parties—who had been
litigating these issues before this Court for three and a half
years—to forego the impending trial and instead proceed to state
court would have been to impose a hardship on them both.  With
these considerations in mind, the Court retained supplemental
jurisdiction over Plaintiff's state-law claims.

declined to rule thereon until after the verdict had been rendered.

The jury deliberated on March 21 and 22, 2019, ECF Nos. 456, 461, and on March 22, 2019, returned a verdict in favor of Plaintiff, ECF Nos. 461, 463.  Finding Defendant liable for assault, battery, and IIED, the jury awarded Plaintiff $722,600, comprising $297,600 in compensatory damages[9] and $425,000 in punitive damages.  ECF No. 463.

## FACTUAL BACKGROUND

The following is a limited summary of the factual background that was developed at trial.

On the evening of June 5, 2013, April Raymond (Plaintiff's ex-wife) called 911 to request a welfare check on her two children, who were then in Plaintiff's (their father's) custody.  Transcript, Jury Trial Day 4 ("Day 4 Tr."), ECF No. 468 at 86:13-19, 87:6 (testimony of April Raymond).  Plaintiff and April Raymond were then in the midst of a custody battle. See, e.g., Transcript, Jury Trial Day 1 ("Day 1 Tr."), ECF No. 448 at 108:14-15, 124:11-17 (testimony of Plaintiff).  According to April Raymond, Plaintiff had, in an earlier telephone conversation with her, said alarming things about, inter alia,

---

[9] The jury found that Plaintiff had suffered $22,000 in special damages and $350,000 in general damages, ECF No. 463 at 4, but also found that Plaintiff had failed to mitigate damages in the amount of $74,400, id. at 7.

"the end of the world" and how she would never again hear the children's voices. Day 4 Tr. at 95:5-18. On a Statement Form later submitted to the Kaua`i Police Department, April Raymond wrote that she received "bizarre texts about blood [and] cutting[, t]he end of the world," and how she needed to repent. Def.'s Ex. 2 ("Statement Form") at 1. She also reported that she had "never seen this level of instability," that Plaintiff's parents had "raised concerns about strange behavior," and that Plaintiff stated to her in a phone call at 7:00 p.m. on June 5, 2013 that his family was trying to kill him. Statement Form at 12.

April Raymond testified that she was concerned for her children and called 911 on the advice of Plaintiff's parents and brother. Day 4 Tr. at 95:19-21, 96:2-7. Plaintiff, on the other hand, testified that April Raymond's 911 call stemmed from his refusal to take the children back to his parents' house, where it was originally planned the children would stay for the night. Day 1 Tr. at 103:2-6, 105:17-19, 106:6-9. According to Plaintiff, his ex-wife fabricated her version of Plaintiff's statements from pieces of previous conversations "for custody purposes." Id. at 124:3-10.

Officers Isaiah Sarsona and Jerald Kim of the Kaua`i Police Department were dispatched on June 5, 2013, to perform the requested welfare check. See Transcript, Jury Trial Day 3

6

("Day 3 Tr."), ECF No. 450 at 79:22-24, 80:8-14 (testimony of
Officer Sarsona).  At the time, Plaintiff was living in a
structure he had constructed on a piece of farm property he
owned.  Day 1 Tr. at 93:5-11, 94:7-12 (testimony of Plaintiff).
The officers made contact with Plaintiff and his sons there.
See Day 3 Tr. at 80:18-25, 81:1-2 (testimony of Officer
Sarsona).  Plaintiff testified that, upon hearing the officers
approach, one of his sons was startled and grabbed a machete
that was in the structure, but Plaintiff told him to put it
down.  Day 1 Tr. at 107:17-25, 108:1-4.  According to Plaintiff,
he was cooperative, speaking first to one officer, who Plaintiff
felt was needlessly hostile, and then to the other, who led him
off the property to the police car.  Id. at 108:5-23, 109:5-9.

        One or both of the officers decided that Officer
Sarsona would transport Plaintiff to Wilcox Memorial Hospital's
emergency room for an involuntary psychological evaluation.  See
Def.'s Ex. 58 ("Incident Sheet"); Day 3 Tr. at 81:17-20
(testimony of Officer Sarsona).  Once at the police car, Officer
Sarsona placed Plaintiff in handcuffs, and possibly ankle
shackles, and transported him to Wilcox Memorial Hospital
without incident.  Incident Sheet; Day 1 Tr. at 42:10-11, 48:12-
14 (testimony of Dr. Christopher Elliott), id. at 109:21-25
(testimony of Plaintiff); Day 3 Tr. at 85:9-15 (testimony of
Officer Sarsona); Day 4 Tr. at 113:14-16 (testimony of April

                              7

Raymond). According to the Incident Sheet and Officer Sarsona's testimony, Plaintiff made a number of outlandish statements while in transit to Wilcox Memorial Hospital and once there. See Incident Sheet (e.g., "Me and my two sons are kings of the Book of Mormon"; reference to a "magic sword"); Day 3 Tr. at 85:16-25, 86:1-25, 87:1-11. Plaintiff denied making most of the reported statements. Day 1 Tr. at 171:2-25, 172:1-22.

Following Plaintiff's removal from his property, his father, Bruce Raymond, went to the Kaua`i Police Department looking for Plaintiff. Transcript, Jury Trial Day 2 ("Day 2 Tr."), ECF No. 449 at 68:11-13 (testimony of Bruce Raymond). There, Bruce Raymond informed a Kaua`i Police Department employee that he thought his son was having psychological problems. Id. at 68:14-21, 74:1-9 (testimony of Bruce Raymond).

Plaintiff arrived at Wilcox Memorial Hospital at 9:41 p.m. Def.'s Ex. 57 ("Admission Record") at 64. At 9:42 p.m., Plaintiff signed a "Terms and Conditions of Service" Form (the "TCS Form"). Def.'s Ex. 6. The one-page TCS Form contained the following paragraphs, inter alia:

> 1. CONSENT TO TREATMENT
> I wish to receive medical care and treatment at Wilcox Memorial Hospital. Accordingly, I consent to the procedures, which may be performed during the hospitalization or clinic visit, including emergency treatment. I authorize and consent to any of the following: X-ray examination, laboratory procedure, other diagnostic procedures,

> medical or surgical treatment, or other
> clinical and hospital service's directed by
> my physician(s) or my physician's(s)
> assistants, which my physician(s) believes
> are advisable to evaluate or treat me, and
> to other services rendered under the general
> and special instructions of my physician(s).
> . . .
> 6. <u>FINANCIAL AGREEMENT</u>
> I understand that I will receive a bill from
> this medical facility.  The physician(s) may
> also bill me separately for their services
> provided to me while at this facility.  I
> further understand not all physicians are
> employees of this medical facility.  I
> understand and agree to pay all charges for
> services rendered and that I am obligated to
> pay for services in accordance with the
> regular rates and terms of this medical
> facility.  This medical facility reserves
> the right to charge a Late Payment Fee
> and/or a Returned Check Fee.

TCS Form.[10]/ [11]/

      After signing the TCS Form, Plaintiff, accompanied by

Officer Sarsona, was taken to a room and placed on a bed.  Day 1

Tr. at 118:5-18 (testimony of Plaintiff).  He was assessed by a

triage nurse, who found him to be alert, appropriate, calm,

cooperative, and oriented to person, time, place, and situation.

---

[10]/ There was substantial evidence from which the jury could have
concluded that Plaintiff did not sign the TCS Form voluntarily.
<u>See, e.g.</u>, Day 1 Tr. at 117:3-25, 118:1-4 (Plaintiff testifying
that he signed the TCS Form at Officer Sarsona's direction,
while still in handcuffs, and because he felt he had to do so in
order to be evaluated by a doctor and thus secure his freedom).
[11]/ While the TCS Form's paragraph 6, entitled "Financial
Agreement," states that "not all physicians are employees of
this medical facility," it does not disclose that Dr. Elliott is
not Defendant's employee.

Day 1 Tr. at 41:1-21 (testimony of Dr. Elliott); Admission
Record at 68.

Dr. Christopher Elliott's shift began at 11 p.m.  Day
1 Tr. at 40:18-19 (testimony of Dr. Elliott).  Dr. Elliott was
not an employee of Defendant, but he runs the Wilcox Memorial
Hospital emergency room while working there, he does not bill
patients directly for his services, and the nurses working in
the Wilcox Memorial Hospital emergency room take direction from
him.  See Day 1 Tr. at 32:3-4 (testimony of Dr. Elliott); id. at
35:24-25, 36:1-6; id. at 33:13-15; id. at 33:1-3.  Sometime
prior to 11:27 p.m., Dr. Elliott examined Plaintiff.  Admission
Record at 67; Day 1 Tr. at 42:16-18 (testimony of Dr. Elliott).
The Kaua`i police had spoken to Dr. Elliott, and Dr. Elliott
asked Plaintiff about reports of bizarre behavior, including
reference Plaintiff had allegedly made to a "magic sword." Id.
at 42:22-25, 43:1-4 (testimony of Dr. Elliott).  Plaintiff
denied having spoken of a magic sword, and also denied having
exhibited any other bizarre behavior.  Id. at 43:5-8 (testimony
of Dr. Elliott); id. at 120:5-15 (testimony of Plaintiff).

After some time, Plaintiff became upset at Dr.
Elliott's line of questioning and refused to speak with him
further.  Day 1 Tr. at 43:15-17 (testimony of Dr. Elliott); id.
at 122:1-8 (testimony of Plaintiff); Admission Record at 67 (Dr.
Elliott's note that Plaintiff became "extremely angry at me and

10

refus[ed] to answer further questions"). Plaintiff testified

that he was calm during this interaction rather than angry and

agitated. Day 1 Tr. at 121:18-23. Dr. Elliott noted, at 11:42

p.m., that it was

> difficult to ascertain whether patient
> actually has had the bizarre behavior claims
> [sic] by others including allegedly of some
> sort of face book [sic] posting possibly
> with the patient holding a machete with some
> sort of comment about it being a "magic
> sword." However, patient denies having made
> any sort of comment and seems to feel angry
> and upset that others are accusing him of
> bizarre behaviors that he denies.

Admission Record at 70-71. Dr. Elliott testified, and his notes

in Plaintiff's medical record reflect, that he was unable at

that point to complete a review of Plaintiff's systems due to

Plaintiff's refusal to speak with him further. Day 1 Tr. at 22-

24; Admission Record at 67.

Sometime after Dr. Elliott left the room, Madeleine

Hiraga-Nuccio, a psychiatric social worker, came in and spoke to

Plaintiff. Day 1 Tr. at 122:19-21 (testimony of Plaintiff); see

Day 3 Tr. at 46:12-24 (testimony of Madeleine Hiraga-Nuccio);

Pl.'s Ex. 6 ("Hiraga-Nuccio Progress Note") at 63 (stating that

this interview took place at 12 a.m.). According to the

Progress Note Hiraga-Nuccio made some time after the

interaction, Plaintiff

> maintained good eye contact, was awake and
> alert . . . . appeared [oriented] to time,

11

> place and person. . . . His cognitive
> ability appears intact.  Thought processes
> are linear and goal-directed with strongly
> paranoid and moderately grandiose content.
> He maintains strong delusions about his
> family and may friends conspiring to harm
> him and his children . . . . Patient appears
> to be experiencing symptoms of psychotic
> disorder of unknown origin with paranoid
> features.

Hiraga-Nuccio Progress Note at 63-64.  Hiraga-Nuccio had spoken

to Officer Sarsona prior to speaking to Plaintiff, and her

Progress Note includes information gathered from outside

sources. Day 3 Tr. at 88:13-23 (testimony of Officer Sarsona);

see, e.g., Day 4 Tr. at 60:9-17, 61:24-25, 62:1-2.

After her interview with Plaintiff, Hiraga-Nuccio

called Dr. Harold Goldberg to obtain his authorization to admit

Plaintiff to Mahelona Medical Center ("Mahelona").  Day 3 Tr. at

62:21-25, 63:1-7, 66:17-18 (testimony of Hiraga-Nuccio); Hiraga-

Nuccio Progress Note at 64.  Dr. Goldberg was then the medical

director of Mahelona, which is a psychiatric facility.  See Day

4 Tr. at 5:22-25, 8:15-25, 9:1-7 (testimony of Dr. Goldberg).

Hiraga-Nuccio also spoke to Dr. Elliott, whose

opinions regarding Plaintiff she recorded on a form entitled

"Emergency Examination/Hospitalization: Certificate of

Physician/Psychiatrist for Admission/Transportation to

Psychiatric Facility Pursuant to HRS Chapter 334-59, As

12

Amended."[12]/ Def.'s Ex. 8 ("MH-4 Form"), at 65.  The MH-4 Form

certifies that Dr. Elliott had examined Plaintiff and had reason

---

[12]/ HRS § 334-59 provides, in subsection (a), three avenues by
which emergency admission to a licensed psychiatric facility may
be initiated.  Under HRS § 334-59(a)(1), the process may be
initiated by law enforcement personnel:

> If a law enforcement officer has reason to
> believe that a person is imminently
> dangerous to self or others, the officer
> shall call for assistance from the mental
> health emergency workers designated by the
> director. Upon determination by the mental
> health emergency workers that the person is
> imminently dangerous to self or others, the
> person shall be transported by ambulance or
> other suitable means, to a licensed
> psychiatric facility for further evaluation
> and possible emergency hospitalization. . .
> .

HRS § 334-59(a)(1).

> Subsection (2) provides that a licensed physician,
social service worker, or professional in a number of other
listed categories may apply to a judge for an ex parte order

> stating that there is probable cause to
> believe  the person is mentally ill or
> suffering from substance abuse, is
> imminently dangerous to self or others and
> in need of care or treatment, or both . . .
> . The order shall direct that a law
> enforcement officer or other suitable
> individual take the person into custody and
> deliver the person to a designated mental
> health program . . . or to the nearest
> facility designated by the director for
> emergency examination and treatment, or
> both. . . .

HRS § 334-59(a)(2).

> Subsection (3) provides for the initiation of this
process by medical personnel:

> Any licensed physician, advanced practice
> registered nurse, physician assistant, or
> psychologist who has examined a person and

(Continued . . .)

to believe that Plaintiff was mentally ill, imminently and
substantially dangerous to others, and in need of further care
or treatment.  Id. at 65-66.  It also states that arrangements
had been made for the Kaua`i Police Department to transport
Plaintiff to Mahelona.  Id. at 66.  Dr. Elliott signed the note,
writing "Wilcox Memorial Hospital" below his printed name.  Id.
at 67.

        Hiraga-Nuccio communicated the substance of the MH-4
Form, along with the information she gathered from Plaintiff and
from Dr. Elliott, to a Hawai`i state judge named Edmund Acoba.
Day 3 Tr. at 64:23-25, 65:1-5 (testimony of Hiraga-Nuccio); see
Pl.'s Ex. 8 ("Acoba Order") at 10.  At 12:30 a.m. on June 6,
2013, Judge Acoba issued an oral order to Hiraga-Nuccio,

---

(. . .)
                has reason to believe the person is:
                        (A) Mentally ill or suffering from
                            substance abuse;
                        (B) Imminently dangerous to self or
                            others; and
                        (C) In need of care or treatment;
                may direct transportation, by ambulance or
                other suitable means, to a licensed
                psychiatric facility for further evaluation
                and possible emergency hospitalization. A
                licensed physician, an advanced practice
                registered nurse, or physician assistant may
                administer treatment as is medically
                necessary, for the person's safe
                transportation. A licensed psychologist may
                administer treatment as is psychologically
                necessary.
HRS § 334-59(a)(3).

memorialized in a written order issued the next day, finding that there was probable cause to believe that Plaintiff was mentally ill, imminently and substantially dangerous to others, and in need of care and/or treatment. Day 3 Tr. at 67:19-25, 68:1, 68:13-16 (testimony of Hiraga-Nuccio); Acoba Order at 10. The Acoba Order directed that Plaintiff be transported to Mahelona "to be held for emergency examination and treatment." Acoba Order at 10; see also Hiraga-Nuccio Progress Note at 64 (noting that "Judge Edmund Acoba authorized involuntary admission to Mahelona[.]").

At 12:43 a.m., Dr. Elliott ordered that Plaintiff be administered 100 milligrams of Haldol and 20 milligrams of Geodon via injection. Day 1 Tr. at 49:3-5, 49:24-25, 50:1-2 (testimony of Dr. Elliott); Admission Record at 87. According to Dr. Goldberg, Geodon would have been intended to sedate and calm Plaintiff, and Haldol to address psychosis. Day 4 Tr. at 11:13-17. Dr. Elliott testified that he felt that both Geodon and Haldol were necessary for Plaintiff's nine-mile, fifteen-to-twenty-five-minute ride from Wilcox Memorial Hospital to Mahelona. Day 1 Tr. at 79:10-15.

Nurse Dallen Johns (who was Defendant's employee), entered Plaintiff's room and informed Plaintiff that he was there to administer medication. Day 3 Tr. at 12:22-24, 16:14-16 (testimony of Nurse Johns). Plaintiff informed Nurse Johns that

15

he did not want medication.  Day 3 Tr. at 16:18–19 (testimony of
Nurse Johns); see Day 1 Tr. at 130:19–21 (testimony of
Plaintiff).  Nurse Johns testified that Plaintiff also told him
that Plaintiff had a magic sword and threatened to use it
against Nurse Johns if he tried to administer medications to
Plaintiff.  Day 3 Tr. at 16:18–21.

Nurse Johns exited the room and communicated
Plaintiff's refusal to Dr. Elliott, who, according to Nurse
Johns, informed Nurse Johns that Plaintiff was "on a MH-4 hold"
and told Nurse Johns to proceed.  Id. at 17:1–7.  Nurse Johns
testified that Dr. Elliott also told him that Plaintiff
"psychologically wasn't stable, and the medication was to help
with that," and further testified to his own understanding that
Plaintiff "needed this medication because he wasn't of his right
mind and had the potential to escalate to being dangerous." Id.
at 38:18–21, 41:20–24.  Nurse Johns did not tell Dr. Elliott
that Plaintiff had threatened him with a magic sword.  Id. at
31:1–24 (testimony of Nurse Johns).

On reentering the room, Nurse Johns told Plaintiff
that he had no choice—that the medication would be administered.
See, e.g., id. at 40:23–25, 41:1 (testimony of Nurse Johns).
Nurse Johns testified that he informed Plaintiff that Dr.
Elliott had said that Plaintiff needed the medication for his
condition.  Id. at 21:4–7.  According to Plaintiff, Nurse Johns

also told him that a judge had ordered that he be given the medication, Day 1 Tr. at 131:19–20, and that "administering the drugs was standard policy," id. at 188:7–10.  Plaintiff nodded his understanding and did not resist receiving the injections. Day 3 Tr. at 37:9–15 (testimony of Nurse Johns); see also Day 1 Tr. at 132:23–24 (testimony of Plaintiff).

Plaintiff testified that Nurse Johns identified the medications only by name, but that he "had never heard of the drug" and was "very frightened" by how fast he felt the effects. Day 1 Tr. at 133:1–19.  Nurse Johns, on the other hand, testified that he told Plaintiff "that the medication was to help him calm down[,] to help him think a little more clearly[,] as well as potential side effects, rash, dizziness, nausea, and if he experienced those, to let us know." Day 3 Tr. at 24:20–23. The medication was administered by injection at 1:03 a.m. on June 6, 2013.  Admission Record at 87.

Dr. Elliott testified that he checked on Plaintiff following the administration of medications.  Day 1 Tr. at 81:20–25, 82:1.  Dr. Elliott's differential diagnosis of Plaintiff was "depression, anxiety, psychosis, schizophrenia, bipolar, toxic or metabolic abnormality, and others." Admission Record at 70; Day 1 Tr. at 61:8–10 (testimony of Dr. Elliott).

Plaintiff was released from Wilcox Memorial Hospital at 2:04 a.m. on June 6, 2013.  Admission Record at 64.  Officer

Sarsona then transported Plaintiff to Mahelona—a nine-mile, fifteen-to-twenty-five-minute drive—without incident. Incident Sheet; see Day 4 Tr. at 32:18-22. Plaintiff testified that he was going in and out of consciousness during the ride and that he was "very scared." Day 1 Tr. at 134:3-24.

Around 9 o'clock on the morning of June 6, 2013, Plaintiff spoke to Dr. Goldberg at Mahelona. See Day 1 Tr. at 138:18-19, 139:2-6 (testimony of Plaintiff). Plaintiff testified that he told Dr. Goldberg that he felt "really sick" and "horrible," and that Dr. Goldberg told him that the Haldol would be in his system for at least thirty days. Day 1 Tr. at 140:7-14; see also Goldberg Initial Assessment, Pl.'s Ex. 22 at 2 (Dr. Goldberg's note reflecting that he made this statement to Plaintiff). Dr. Goldberg, finding in Plaintiff "no evidence of dangerousness to himself or others," released Plaintiff from Mahelona that morning. See Goldberg Initial Assessment at 2.

Plaintiff's understanding was that his release was based upon his agreement to certain "stipulations": that he be cared for by his mother (a registered nurse), that he take more medications that Dr. Goldberg would prescribe, and that he return to see Dr. Goldberg periodically. Day 1 Tr. at 139:25, 140:1-5, 140:12-24, 141:14-21. Dr. Goldberg explained to Plaintiff that he had been given Haldol because it was an antipsychotic drug and he had appeared to be psychotic, and that

18

Dr. Goldberg was prescribing Plaintiff with more Haldol—ten milligrams to be taken nightly for ten days—to wean Plaintiff off the initial dose and/or to supplement it.  Day 4 Tr. at 17:2-10 (testimony of Dr. Goldberg); id. at 16:19-21; Goldberg Initial Assessment at 2; see Day 4 Tr. at 17:11-18.  Dr. Goldberg also prescribed Cogentin "if needed for stiffness or extrapyramidal side effects," which Dr. Goldberg testified were "not unusual side effects from Haldol."  Goldberg Initial Assessment at 2; Day 4 Tr. at 21:15-17.

Dr. Goldberg's discharge diagnosis of Plaintiff was "psychotic disorder, not otherwise specified, with severe paranoia." Goldberg Initial Assessment at 2.

Plaintiff's brother took him from Mahelona to their parents' house.  Day 1 Tr. at 142:18-20 (testimony of Plaintiff).  Plaintiff was "miserable"; every muscle in his body ached, he was "cramped up" and "couldn't walk," and he "had to do little baby, baby shuffle steps to get around anywhere." Day 1 Tr. at 143:5-12.  Plaintiff testified that his parents cried when they saw his condition.  Id. at 143:13-15.

Further testimony regarding Plaintiff's condition after his visit to Wilcox Memorial Hospital is cited and discussed below.  See Secs III and IV.C, infra.

Plaintiff continued to see Dr. Goldberg after the incident, apparently visiting him seven times.  See Def.'s Ex.

55 ("June 13, 2013 Progress Note"); Def.'s Ex. 53 ("July 8, 2013 Progress Note"); Def.'s Ex. 52 ("July 22, 2013 Progress Note"); Def.'s Ex. 51 ("August 12, 2013 Progress Note"); Def.'s Ex. 50 ("Sept. 13, 2013 Progress Note"); Def.'s Ex. 49 ("November 8, 2013 Progress Note"); Def.'s Ex. 48 ("February 13, 2014 Progress Note").

Dr. Goldberg noted that the Haldol caused Plaintiff side effects. See, e.g., June 13, 2013 Progress Note at 46 (noting that Plaintiff was "saying he felt stiff and shaky. He had been given Haldol Decanoate 30 mg in the emergency room and that was probably causing him to have extrapyramidal side effects which is not an unusual side effect from Haldol Decanoate."); Day 4 Tr. at 21:18-21 (testimony of Dr. Goldberg that his notation of "30 mg" was an error); Goldberg Discharge Summary, Pl.'s Ex. 10 ("He received Haldol D in the ER at Wilcox which resulted in severe extrapyramidal side effects but they resolved over time."); July 22, 2013 Progress Note ("Mad about getting the IM Haldol D as it caused him some side effects."). Dr. Goldberg also noted Plaintiff's depression. See July 8, 2013 Progress Note ("Has been anorexic, insomnia, with depressed mood, loss of interest, and loss of appetite."); July 22, 2013 Progress Note ("Has mood swings and when he is down he gets suicidal and feels very bad inside.").

To address the symptoms and issues Plaintiff was experiencing (and in addition to the supplemental Haldol dose initially prescribed), Dr. Goldberg prescribed Plaintiff various medications, including: Cogentin, to address "the stiffness and extrapyramidal side effects" of Haldol; Valium; Remeron "to allow him to sleep better and improve appetite" and to help with his depressed mood; and lithium.  See Day 4 Tr. at 17:11–18, 33:4–5, 46:17–25, 47:1-6 (testimony of Dr. Goldberg); June 13, 2013 Progress Note; July 8, 2013 Progress Note; July 22, 2013 Progress Note.

The Progress Notes indicate that Plaintiff stopped taking some or all of his prescribed medications as early as July 8, 2013.  See July 8, 2013 Progress Note ("Since then he was to take [C]ogentin but was non[-]compliant with taking it as ordered and his symptoms have gradually increased."); see also July 22, 2013 Progress Note ("Has not taken his medications and threw them away."); November 8, 2013 Progress Note ("Has stopped his meds and is somewhat in denial but it is impossible to convince him otherwise so will follow off meds and see if he relapses.").  Plaintiff testified that he told Dr. Goldberg on June 6, 2013 that "I don't need drugs.  I don't want to take any drugs. . . . I feel horrible because of those drugs." Day 1 Tr. at 140:25, 141:1-2.  Plaintiff also testified that he felt better only after he "went against Dr. Goldberg's orders" and

stopped taking the medication, apparently at the end of his

course of treatment with Dr. Goldberg.  <u>See</u> Day 1 Tr. at 154:13-

25, 155:1-20.

Dr. Goldberg initially diagnosed Plaintiff with

Bipolar I Disorder, most recent episode, but on February 13,

2014, replaced that diagnosis with Brief Psychotic Disorder.[13/]

June 13, 2013 Progress Note; February 13, 2014 Progress Note;

Day 4 Tr. at 33:10-20 (testimony of Dr. Goldberg).

<b><u>STANDARD</u></b>

Rather than ruling immediately on a motion for

judgment as a matter of law made before the case is submitted to

the jury, a district court may, under Federal Rule of Civil

Procedure ("Rule") 50(b), "defer its ruling and make a later

determination of the legal questions raised by the motion. . . .

The Court's deferred consideration effectively converts the

motion into a post-verdict Rule 50(b) motion." <u>Merino v.

Marchon, Inc.</u>, No. 92 4662 WDK (JRX), 1994 WL 695826, at *4

(C.D. Cal. Apr. 4, 1994), aff'd, 74 F.3d 1259 (Fed. Cir. 1996)

(citing <u>Biodex v. Loredan Biomedical</u>, 946 F.2d 850, 861 (Fed.

Cir. 1991)); <u>see also</u> <u>Runnings v. Ford Motor Co.</u>, 461 F.2d 1145,

1148 n.4 (9th Cir. 1972) (noting the "desirability of

---

[13/] Dr. Goldberg testified that he changed his diagnosis of
Plaintiff at Plaintiff's request, Day 4 Tr. at 65:24-25, but
also testified that he had used his own judgment to do so, <u>id.</u>
at 66:1-8.

22

withholding action on motions for directed verdicts and permitting the jury to reach a verdict"); Krechman v. Cty. of Riverside, 723 F.3d 1104, 1110 (9th Cir. 2013) (iterating that "taking a motion under submission and ruling on it after the jury returns a verdict is a proper practice"); Fed. R. Civ. P. 50(b) Advisory Committee's Note to 1991 Amendment (citing the potential for a movant's verdict mooting the motion, and for a reversal on appeal requiring a new trial, as reasons that "a court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence").

A district court ruling on a motion for judgment as a matter of law "may not substitute its view of the evidence for that of the jury," Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001), and must uphold the jury's verdict if it is supported by substantial evidence. See Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007) (citing Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001)). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." Johnson, 251 F.3d at 1227. A district court ruling on a motion for judgment as a matter of law should review the record as a whole, but must disregard all evidence favorable to the moving party that the jury is not required to believe. Johnson, 251

F.3d at 1227 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000) ("That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." (citation and internal quotations marks omitted))).

In ruling on such a motion, the court must not weigh the evidence or make credibility determinations, <u>Reeves</u>, 530 U.S. at 150, "but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion," <u>Wallace</u>, 479 F.3d at 624 (citing <u>Johnson</u>, 251 F.3d at 1227–28). "The evidence must be viewed in the light most favorable to the nonmoving party, and all inferences must be drawn in favor of that party." <u>Id.</u>; <u>see also</u> <u>Reeves</u>, 530 U.S. at 150 (noting that the standard for judgment as a matter of law mirrors that for summary judgment). "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." <u>Wallace</u>, 479 F.3d at 624 (citing <u>McLean v. Runyon</u>, 222 F.3d 1150, 1153 (9th Cir.2000)). The "high hurdle" the moving party must clear in order to obtain relief "recognizes that credibility, inferences, and factfinding are the province of the

jury, not [the] court." <u>Costa v. Desert Palace, Inc.</u>, 299 F.3d 838, 859 (9th Cir. 2002).

**DISCUSSION**

In its Motion, Defendant argues for its entitlement to judgment as a matter of law on a number of grounds.  The Court addresses each argument in turn.

**I.    There Is Substantial Evidence to Support a Finding That Dr. Elliott Was an Agent of Defendant**

In arguing that Plaintiff did not establish that Dr. Christopher Elliott—who ordered the administration of medications to Plaintiff, <u>see</u> Day 1 Tr. at 49:3–5, 49:24–25, 50:1–11—was its agent, Defendant contends that "[t]here is no evidence of any actual authority granted to Dr. Elliott by [Defendant]," Mem. in Supp. at 3.  Finding substantial evidence to support a finding of agency[14] under the theory of implied actual authority, the Court disagrees.

---

[14] Although no such argument is contained in its written Rule 50 Motion, Defendant, while arguing the Motion, stated that the pleadings contained no allegation that Dr. Elliott was an agent of Defendant.  Day 4 Tr. at 77:18–25, 78:1–18.  <u>See</u> Compl. ¶ 61(denoting Dr. Elliott only as "Chris Elliott, a doctor at W[ilcox] M[emorial] H[ospital]"); <u>but see</u> <u>id.</u> ¶¶ 115, 119 (referring to "W[ilcox] officials and agents").  The Court notes that Defendant did not raise an objection at trial, and that by the thrust of its pretrial conduct (e.g., not objecting to Plaintiff's proposed jury instructions on these grounds; joining Plaintiff in submitting Joint Proposed Jury Instruction No. J-8, which outlines how liability can attach through the act of an (Continued . . .)

25

"An agency relationship may be created through actual or apparent authority.  Actual authority exists only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act[,] and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances." Cho Mark Oriental Food, Ltd. v. K & K Int'l, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992) (citations and internal quotation marks omitted).  "Express actual authority requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts." Id. at 515–16, 836 P.2d at 1062 (citations omitted).  "Implied actual authority may arise either independent of any express grant of authority or as a necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal." Id. at 516, 836 P.2d at 1062 (citation and internal quotation marks omitted).  As to implied actual authority, "the focus is on the agent's understanding of this authority inasmuch as the relevant inquiry

_____

(. . .)
agent, ECF No. 387 at 9), Defendant impliedly consented to the trial of this issue, insofar as the issue was not raised in the Complaint.  See Fed. R. Civ. P. 15(b)(2).  Plaintiff may move to amend his Complaint to conform it to the evidence in this respect, but any failure to do so does not affect the result of the trial of this issue.  Id.

is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act." Id.

The Court finds that, as a matter of law, Dr. Elliott was not an agent of Defendant through the operation of express actual authority. As Defendant points out, "there is no evidence that there was an agreement between Dr. Elliott and [Defendant] that Dr. Elliott would act as an agent for [Defendant]." Mem. in Supp. at 5. As Plaintiff presented no evidence of any written or oral agreement between Defendant and Dr. Elliott—let alone one that authorized Dr. Elliott to do certain acts—substantial evidence would not support a finding that Dr. Elliott was an agent of Defendant through the operation of express actual authority. See Cho Mark Oriental Food, Ltd., 73 Haw. at 516-15, 836 P.2d at 1062.

However, Plaintiff adduced substantial evidence of agency under the theory of implied actual authority. Dr. Elliott testified that, in his work at Wilcox Memorial Hospital, he was "running [Defendant's] 20-bed emergency room[.]" Day 1 Tr. at 9:4; see also id. at 36:24-25, 35:1, 70:21-22; Day 3 Tr. at 30:5-8 (testimony of Nurse Johns). This work included: "very frequently" working with a psychiatric social worker to assess and treat patients pursuant to HRS § 334-59(a); ordering

27

medication presumably owned by Defendant, and obtained from
Defendant's Pyxis medication machine; and recording his
observations and diagnoses of Plaintiff directly into
Defendant's medical records system.  See Day 1 Tr. at 37:1–6,
67:12–25, 68:1–3 (testimony of Dr. Elliott); Day 3 Tr. at 18:21–
25 (testimony of Nurse Johns).  There was also testimony that,
when Dr. Elliott practiced medicine at Wilcox Memorial Hospital,
the nurses working there took instruction from him, including at
least one nurse who was Defendant's employee.  Day 1 Tr. at
33:1–3 (testimony of Dr. Elliott); Day 3 Tr. at 12:16–25, 13:1–
5, 17:1–7 (testimony of Nurse Johns).  And Dr. Elliott further
testified that he was responsible for overseeing Plaintiff's
overall care and treatment while Plaintiff was at Wilcox
Memorial Hospital.  Day 1 Tr. at 39:21–23; see also Day 3 Tr. at
30:9–13 (Nurse Johns's testimony that Dr. Elliott had the
authority to order and administer drugs).  In other words,
Defendant evidently acquiesced to Dr. Elliott's conduct on its
behalf—which included running its emergency room, assessing and
treating patients under HRS § 334-59(a), giving directions to
its employees, and overseeing the care and treatment of its
patients—and Dr. Elliott, reasonably believing Defendant desired
him to do so, undertook Plaintiff's treatment, which included
ordering the administration of medication on June 6, 2013.

Because there is substantial evidence in the record to
support a jury finding that Dr. Elliott was acting as
Defendant's agent under the theory of implied actual authority,
Defendant's motion for judgment as a matter of law on the issue
of agency is denied.

II.  **There Is Substantial Evidence to Support a Finding of
Liability for Assault and Battery**

A. **There Is Substantial Evidence to Support a Finding
of the Requisite Intent**

Defendant argues that it is entitled to judgment as a
matter of law as to Plaintiff's assault and battery claims
because Plaintiff did not establish that Nurse Johns—who
administered the at-issue medications to Plaintiff via
injection, and who was Defendant's employee—had the intent
required to establish liability for these torts.  Mem. in Supp.
at 9–11; <u>see</u> Day 3 Tr. at 22:4–9, 23:3–6, 40:19–22 (testimony of
Nurse Johns).  In so arguing, Defendant both misstates the
intent requisite for these torts and misconstrues the record.
The Court finds that, contrary to Defendant's assertions,
Plaintiff adduced substantial evidence to support the jury's
finding that the requisite intent was present.

Under Hawai`i state law, the requisite intent for the
tort of assault is the intent to cause another a harmful or
offensive contact.  <u>See</u> <u>McCormack v. City and Cty. of Honolulu</u>,

762 F. Supp. 2d 1246, 1253 (D. Haw. 2011) (citing Mukaida v.
Hawaii, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001)).  By
contrast, the requisite intent for the tort of battery is merely
the intent to cause bodily contact.   See Williams v. Aona, 121
Haw. 1, 13, 210 P.3d 501, 513 (2009) (citation omitted).  Here,
Nurse Johns's testimony provides substantial evidence for the
jury to find both that Nurse Johns intended the contact itself
and that he intended its harmful or offensive nature.[15/]

        Both Plaintiff and Nurse Johns testified that Nurse
Johns injected medications into Plaintiff, and Nurse Johns
testified that he informed Plaintiff of his intention to
administer medications prior to doing so.  Day 2 Tr. at 16:2-4,
16:22-23 (testimony of Plaintiff); see Day 3 Tr. at 23:3-6,
23:11-14 (testimony of Nurse Johns); id. at 16:14-16 (same).
There is no evidence in the record that Nurse Johns's injection
of Plaintiff was anything but intentional.  The conclusion that

---

[15/] The Court finds there was substantial evidence for the jury
to conclude that Nurse Johns was acting within the scope of his
employment, and therefore Defendant was responsible for Nurse
Johns's actions under the doctrine of respondeat superior.  See
Wong-Leong v. Hawaiian Indep. Refinery, Inc., 76 Haw. 433, 438,
879 P.2d 538, 543 (1994).  Further, the Hawai`i Supreme Court has
stated that "an employer may be liable 'for the intentional
torts of its employee as the law now imposes liability where the
employee's purpose, however misguided, is wholly or in part to
further the master's business.'" State v. Hoshijo ex rel. White,
102 Haw. 307, 319 n.27, 76 P.3d 550, 562 n.27 (2003) (brackets
and some internal quotation marks omitted) (quoting Burlington
Indus. Inc. v. Ellerth, 524 U.S. 742, 756 (1998)).

the contact was intentional is thus supported by substantial evidence, as is the corollary conclusion that the intent requisite for battery was present.

In arguing that Nurse Johns did not intend to cause a harmful or offensive contact, Defendant asserts that Nurse Johns testified "that he had no intent to cause harm when he administered medications to Plaintiff." Mem. in Supp. at 10; Day 3 Tr. at 24:24-25 (testimony of Nurse Johns); see also Day 3 Tr. at 39:23-25, 40:1-2 (testimony of Nurse Johns that his "first job is to represent the patient" and the patient's interests, and that "if I don't have to administer a medication to a patient, if they're saying no, they're refusing it, I'm not going to administer the medication."). But insofar as it is asserting that the requisite intent for either assault or battery is an intent to cause harm, see, e.g., Mem. in Supp. at 10 ("Nurse Johns testified that he had no intent to cause harm when he administered medications to Plaintiff."); id. at 9 ("Plaintiff Has Not and Cannot Establish An Intent To Cause Harm By Wilcox"), Defendant is mistaken. And even if Nurse Johns's testimony can be said to establish that he did not intend a harmful contact, there is substantial evidence for the jury to find that he intended an offensive one.

"A bodily contact is offensive 'if it offends a reasonable sense of personal dignity.'" Mukaida, 159 F. Supp. 2d

31

at 1223 (quoting Restatement (Second) of Torts § 19 (1965)). Here, it is clear from Nurse Johns's testimony that he was aware that Plaintiff did not want to be administered medication, see, e.g., Day 3 Tr. at 40:14-17, 23-25, 41:1, 37: 7-15, and that Nurse Johns administered the medication anyway, id. at 37:12-15; see id. at 23:3-6, 11-14; Day 2 Tr. at 16:2-4, 16:22-23 (testimony of Plaintiff). There is substantial supporting evidence that the injection of unwanted medications would offend a reasonable sense of personal dignity and is thus properly considered an offensive bodily contact. Based on the uncontroverted testimony regarding Nurse Johns's intent and commensurate actions, the Court finds that the jury's conclusion that Nurse Johns possessed the requisite intent for assault is supported by substantial evidence.

Defendant's motion for judgment as a matter of law as to Plaintiff's claims for assault and battery is denied because there is substantial evidence to support the jury's findings that the requisite intent for each tort was present.

### B. There Is Substantial Evidence to Support a Finding of Causation

Defendant next argues that it is entitled to judgment as a matter of law because Plaintiff presented no expert

testimony regarding causation,[16/] and "[w]ithout expert testimony, Plaintiff cannot prove that it was the Haldol that caused his alleged injuries." Mem in Supp. at 12. This argument misses the mark for several reasons.

First, and as Plaintiff points out in his Opposition, Plaintiff's claimed damages are not limited to those caused by the physical effects of Haldol, but include emotional distress damages as well. Opp. at 15; see also Compl. ¶¶ 74, 76, 99, 100, 110, 143. Under Hawai`i law, a plaintiff need not adduce expert testimony to establish his entitlement to damages for emotional distress. See, e.g., Campbell v. Animal Quarantine Station, 63 Haw. 557, 564, 632 P.2d 1066, 1070-71 (1981) (noting that medical testimony is not a prerequisite for recovery for emotional distress, and that its absence is "not . . . a bar to recovery"); Black v. City and Cty. of Honolulu, No. CV 07-00299 DAE-LEK, 2009 WL 4217460, at *9 (D. Haw. Nov. 25, 2009), aff'd, 512 F. App'x 666 (9th Cir. 2013) ("Expert medical testimony is not necessary to award emotional distress damages." (citing In re Haw. Fed. Asbestos Cases, 734 F. Supp. 1563, 1568 (D. Haw. 1990))); Black, 2009 WL 4217460, at *9 ("[A] plaintiff can . . . establish . . . emotional distress damages through non-expert

---

[16/] The Court notes that, because neither party designated any expert witness (medical or otherwise), the informative testimony available to the jury was necessarily limited in scope.

testimony or even without evidence if the circumstances make it obvious that a reasonable person would suffer significant emotional harm." (citation omitted)).

And Plaintiff adduced substantial evidence that the Defendant's administration of Haldol caused him emotional distress. He himself testified to this effect, and this testimony was corroborated by both admitted documentary evidence and the testimony of other witnesses. See, e.g., Day 1 Tr. at 131:8–16, 133:16–19, 143:24–25, 146:14–16, 146:23–25, 149:25, 150:1, 152:21–23, 154:4–6, 156:24–25, 157:1–4 (testimony of Plaintiff); July 8, 2013 Progress Note; July 22, 2013 Progress Note; February 13, 2014 Progress Note; Goldberg Discharge Summary (medical records indicating Plaintiff's depressed mood after the administration of Haldol); Day 4 Tr. at 28:22–25 (testimony of Dr. Goldberg that Plaintiff was distressed about the administration of Haldol); id. at 33:4–9 (testimony of Dr. Goldberg that Plaintiff was prescribed medication for several months after the incident to deal with his depressed mood); Day 2 Tr. at 62:7–9 (testimony of Bruce Raymond that Plaintiff was depressed after receiving Haldol). Therefore, there was substantial evidence for the jury to find that Defendant's conduct was a legal cause of Plaintiff's emotional distress.

Second, the authoritative cases to which Defendant points as supporting its claim that expert testimony was

required to establish causation of Plaintiff's claimed physical harm are inapposite.  It is true that Hawai`i law requires the provision of expert testimony in medical malpractice cases where causation and the applicable standard of care are beyond common knowledge.  See, e.g., Barbee v. Queen's Med. Ctr., 119 Haw. 136, 158-59, 194 P.3d 1098, 1120-21 (Ct. App. 2008).  But Defendant cites no Hawai`i law to support its argument that this requirement holds true in a case such as this one, where medical negligence is not at issue and there is no need to establish the applicable standard of care.  See Craft v. Peebles, 78 Haw. 287, 298, 893 P.2d 138, 149 (1995) (noting that expert medical testimony is required in medical malpractice actions to establish "[t]he standard of care to which a doctor has failed to adhere").

Here, the jury had substantial evidence that Haldol that was administered to Plaintiff caused adverse physical effects.  The testimony of Dr. Goldberg, as well as the admitted medical records, directly addressed the physical effects of Haldol that Plaintiff experienced.  See, e.g., Goldberg Discharge Summary (medical record stating that Plaintiff "received Haldol D in the ER at Wilcox which resulted in severe extrapyramidal side effects"); Day 4 Tr. at 21:9-17 (testimony of Dr. Goldberg noting that Plaintiff reported feeling "stiff and shaky" after being injected with Haldol, and that such

"extrapyramidal side effects" are "not unusual side effects from Haldol"); see also id. at 22:9-13 (confirming that such side effects are "common"), 32:6-9 (noting that Plaintiff's extrapyramidal side effects were "severe"), 43:12-24 (again describing extrapyramidal side effects); June 13, 2013 Progress Note at 46 (medical record stating that extrapyramidal side effects are "not unusual" from Haldol).

Plaintiff also testified regarding the physical symptoms he experienced following the administration of Haldol, and his parents testified as to the appearance of his physical symptoms after said administration. See, e.g., Day 1 Tr. at 138:11-16 (Plaintiff stating that his body hurt, he felt sick, and he felt like he had drunk poison), 143:1-12 (stating that every muscle in his body ached, he was "cramped up," and he could not walk), 146:17-22 (adding that he could not breathe), 148:6-7 (stating that he did not have the energy to go outside), 153:15-25 (stating that he felt the same for roughly forty days after the incident); Day 2 Tr. at 37:21-25, 38:1-5 (Plaintiff's mother, Dianna Raymond, testifying that, the day after being injected with Haldol, Plaintiff "looked like somebody who had Parkinson's" and that "he shuffled like an old, old . . . man"), 41:3-6 (same), 61:16-20 (Bruce Raymond testifying that "he was like a zombie. . . . [H]e had his hands like a praying mantis, and he was shuffling like a 80- or 90-year-old man").

Third, and although Defendant does not appear to argue that Plaintiff was required to adduce expert testimony to establish his entitlement to special damages, the Court finds that Plaintiff adduced substantial evidence of causation regarding, and his entitlement to, the same.  Plaintiff testified that he sold his farm at a loss because he was unable to take care of it due to his reaction to Haldol.  See Day 1 Tr. at 151:14-25, 152:1-6.  Plaintiff also testified that he was substantially unable to work after receiving the Haldol injection because he was in pain and felt confused.  Id. at 149:14-24; see also Day 2 Tr. at 63:3-17 (testimony of Bruce Raymond that Plaintiff's ability to work suffered after the incident).  The jury therefore had substantial evidence that Defendant's administration of Haldol to Plaintiff caused him to suffer special damages.

In sum, Plaintiff adduced substantial evidence that Defendant's actions caused his damages.  Because the jury had substantial evidence to support findings of causation, Defendant's motion for judgment as a matter of law on this issue is denied.

**III. There Is Substantial Evidence to Support a Finding of Liability for IIED**

Defendant asserts that it is entitled to judgment as a matter of law on Plaintiff's claim for IIED.  In part premising

its arguments on its earlier contention that Dr. Elliott, who ordered the administration of Haldol, was not its agent, Defendant asserts that: (1) the actions of Nurse Johns, who injected Plaintiff with Haldol, were neither intentional nor reckless, Mem. in Supp. at 16–17; (2) Nurse Johns's actions were not outrageous, id. at 17; and (3) in the absence of expert testimony, Plaintiff necessarily cannot establish "that the pharmacological effects of Haldol caused him extreme emotional distress," see id. at 17–18.

A plaintiff asserting a claim for IIED must establish "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress" to him.  Hac v. Univ. of Haw., 102 Haw. 92, 106–07, 73 P.3d 46, 60–61 (2003).

## A. There Is Substantial Evidence to Support a Finding That Defendant Acted Recklessly

"To demonstrate the first element [of IIED], a plaintiff must show that the defendant acted either with a 'desire to inflict severe emotional distress, . . . where he knows that such distress is certain, or substantially certain, to result from his conduct' or 'recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow.'" Ritchie v. Wahiawa Gen. Hosp., 597 F.

Supp. 2d 1100, 1110 (D. Haw. 2009) (quoting Restatement (Second) Torts Section 46, cmt. i (1965)).

Here, the jury was presented with evidence that Dr. Elliott ordered that Plaintiff be injected with Haldol without his permission, and despite the fact that Plaintiff was apparently lucid. See, e.g., Day 1 Tr. at 58:22-24 (testimony of Dr. Elliott); Day 3 Tr. at 17:1-7 (testimony of Nurse Johns that he informed Dr. Elliott of Plaintiff's refusal and Dr. Elliott told him to proceed with the injections); Admission Record at 69 (noting that, on Dr. Elliott's examination, Plaintiff was "alert and oriented to person, place, and time"); Day 1 Tr. at 41:12-21 (Dr. Elliott's testimony that a nurse documented Plaintiff as being alert and appropriate, calm and cooperative, and oriented to person, time, place, and situation). Dr. Elliott did so in the full knowledge that Plaintiff was refusing medication, and without discussing Haldol, its purpose, or its potential side effects with Plaintiff. Day 3 Tr. at 17:1-7 (testimony of Nurse Johns); Day 1 Tr. at 58:7-21 (testimony of Dr. Elliott). Moreover, the jury heard testimony that extrapyramidal side effects (which include stiffness and shakiness) are not unusual from Haldol, and could easily have drawn the obvious inference that Dr. Elliott ordered the nonconsensual administration of Haldol despite an awareness of the potential that Plaintiff would experience those side

effects.  Day 4 Tr. at 21:11–17 (testimony of Dr. Goldberg).

Moreover, the Haldol dosage appeared to have been calculated to

last for far longer than it would take for Plaintiff to be

transported from Wilcox Memorial Hospital to Mahelona—in fact,

per Dr. Goldberg, it would be in Plaintiff's system for thirty

days.  Day 4 Tr. at 16:11–13, 17:11–18 (Dr. Goldberg testifying

that he told Plaintiff the Haldol would remain in his system for

thirty days); Goldberg Initial Assessment (Dr. Goldberg's June

7, 2013 notes indicating that Plaintiff "received in the

emergency room, Haldol decanoate 100 mg, which will be in his

system for 1 month").

      These facts constitute substantial evidence to support

the jury finding that Defendant's conduct was reckless by the

actions of its agent Dr. Elliott in ordering its employee, Nurse

Johns, to inject Plaintiff with one hundred milligrams of

Haldol.  In view of the fact that Dr. Elliott ordered the

injection against Plaintiff's will and without discussing the

drug with him, while almost certainly knowing of the potential

for adverse side effects and the length of time Haldol would be

in Plaintiff's system, the jury had substantial evidence to

conclude that Dr. Elliott acted "in deliberate disregard of a

high degree of probability that emotional distress [would]

follow." Ritchie, 597 F. Supp. 2d at 1110.

## B. There Is Substantial Evidence to Support a Finding

## That the Conduct of Defendant Was Outrageous

A finding that the complained-of conduct was "outrageous" is a predicate for the attachment of liability for IIED. See Hac, 102 Haw. at 106, 73 P.3d at 60 (adopting "the approach set forth in the Restatement (Second) of Torts"). Liability for IIED will be found

> "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

Ross v. Stouffer Hotel Co. (Hawai`i) Ltd., 76 Haw. 454, 465 n.12, 879 P.2d 1037, 1048 n.12 (1994) (quoting Restatement (Second) of Torts § 46 cmt. d). Here, the jury had substantial evidence that Dr. Elliott ordered the administration of a long-acting antipsychotic drug to an apparently nonviolent, lucid patient without his consent and putatively in order to ensure his safe transportation to a facility nine miles away—and thus substantial evidence to conclude that Defendant's conduct, through its agent, was outrageous.

The jury received evidence that Dr. Elliott directed the administration to Plaintiff of one hundred milligrams of

Haldol.  See, e.g., Admission Record at 87 (medical record documenting that Dr. Elliott ordered that Plaintiff be given Haldol).  The jury was also presented with evidence that Haldol is a long-acting antipsychotic.  See Day 1 Tr. at 79:7-9 (Dr. Elliott testifying that Geodon is a short-acting alternative to Haldol); Day 4 Tr. at 16:11-13, 17:11-18 (Dr. Goldberg testifying that he told Plaintiff the Haldol would remain in his system for thirty days); Goldberg Initial Assessment (Dr. Goldberg's June 7, 2013 notes indicating that Plaintiff "received in the emergency room, Haldol decanoate 100 mg, which will be in his system for 1 month"); Day 4 Tr. at 17:8-10 (Dr. Goldberg testifying that Haldol is "an antipsychotic agent").  Testimony established that, while Geodon's use was "to calm [Plaintiff] and sedate him and make him easier to transport" the nine miles from Wilcox Memorial Hospital to Mahelona, Haldol "was specifically for the psychotic-like things [Plaintiff] had been saying."  Day 4 Tr. at 11:13-17, 11:21-25, 12:1 (testimony of Dr. Goldberg).

        The jury heard testimony and viewed evidence to the effect that Plaintiff was noncombative and lucid while at Wilcox Memorial Hospital.  See, e.g., Admission Record at 69 (noting that, on Dr. Elliott's examination, Plaintiff was "alert and oriented to person, place, and time"); Day 1 Tr. at 41:12-21 (Dr. Elliott's testimony that a nurse documented Plaintiff as

being alert and appropriate, calm and cooperative, and oriented to person, time, place, and situation); id. at 47:2-4, 47:13-25 (Dr. Elliott testifying that he was uncertain, after examining Plaintiff, whether Plaintiff had been behaving bizarrely earlier in the evening, and that Dr. Elliott did not observe Plaintiff behaving violently or threatening anyone); Admission Record at 70 (noting Dr. Elliott's uncertainty regarding Plaintiff's past bizarre behavior); Day 1 Tr. at 121:21-22 (Plaintiff testifying that he was calm while speaking to Dr. Elliott); id. at 127:12-18 (Plaintiff testifying that he stayed calm and didn't raise his voice while at Wilcox Memorial Hospital); id. at 131:10-13 (Plaintiff testifying that he was "calm and peaceful" while at Wilcox Memorial Hospital).

The jury further heard testimony that Plaintiff did not consent to the administration of medication, see, e.g., Day 1 Tr. at 131:18-19 (Plaintiff's testimony that he did not consent to the administration of Haldol)—a fact of which Dr. Elliott was aware, see Day 3 Tr. at 17:1-7 (Nurse Johns testifying that he informed Dr. Elliott of Plaintiff's refusal, and that Dr. Elliott told Nurse Johns that "we were to proceed with medication administration"). And Plaintiff testified that the first time he learned what sort of medications he was being

given was during the injections, and that then he was only told the drugs' names.  Day 1 Tr. at 130:22-25, 133:1-7.[17/]

Finally, there is substantial evidence to support the jury's conclusion, memorialized in the Special Verdict Form, ECF No. 463 at 4, that the administration of Haldol was not medically necessary for Plaintiff's safe transportation to Mahelona, and thus did not come within the authority of HRS § 334-59(a)(3), see, e.g., Day 3 Tr. at 76:11-15 (testimony of Hiraga-Nuccio confirming that the court order did not contain an authorization for Defendant to administer medication to Plaintiff).  Dr. Goldberg testified that, of the two drugs Plaintiff was administered, only Geodon was "to calm [Plaintiff] and sedate him and make him easier to transport" nine miles from Wilcox Memorial Hospital to Mahelona, whereas Haldol "was specifically for the psychotic-like things" Plaintiff had allegedly been saying.  Day 4 Tr. at 11:13-17, 11:21-25, 12:1.

The recitation of the foregoing—that Dr. Elliott ordered that Plaintiff be administered a long-acting antipsychotic drug without Plaintiff's consent, without the statutory authority of HRS § 334-59(a)(3), and despite the fact

---

[17/] Nurse Johns testified that he informed Plaintiff, prior to injecting him with Haldol, of the "potential side effects [of] rash, dizziness, [and] nausea[.]" Day 3 Tr. at 24:21-22.  On the other hand, Plaintiff testified that Nurse Johns told him nothing about the drug prior to injection. Day 1 Tr. at 130:22-25, 133:1-7.

that Plaintiff was at the time lucid and noncombative—"to an average member of the community [might well] arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46 cmt. d.  And, as Plaintiff points out in his Opposition, Opp. at 29, where reasonable minds could differ as to outrageousness, the question is one that "should be left to the jury," Ross, 76 Haw. at 465, 879 P.2d at 1048 (internal quotation marks and citation omitted). In sum, the jury had substantial evidence to support its finding that the conduct of Defendant—acting through its agent Dr. Elliott who directed its employee Nurse Johns to inject one hundred milligrams of Haldol into Plaintiff under these circumstances—was outrageous.

### C. There Is Substantial Evidence to Support a Finding of the Causation Requisite for IIED

Hearkening back to its previous argument regarding the necessity of expert testimony to establish causation, Defendant asserts that "Plaintiff's assertion that the pharmacological effects of Haldol caused him extreme emotional distress requires the presentation of expert testimony." Mem. in Supp. at 17 (citing Fed. R. Evid. 702(a)); see also Hac, 102 Haw. at 106–07, 73 P.3d at 60–61 (laying out the elements of IIED, which include causation).  Insofar as Defendant is contending again that expert testimony is required in order to establish causation of

physical harm or injuries, the Court finds this argument no more availing here than it was when first raised.  See Sec. III, supra.  The Court will not repeat its earlier disposition of that argument, but to the extent Defendant is asserting that Plaintiff failed to provide substantial evidence that the incident caused him severe emotional distress, the Court disagrees.

The Hawai`i Supreme Court has defined "severe emotional distress" as "mental suffering, mental anguish, mental or nervous shock, and including all highly unpleasant mental reactions, such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." Id. at 106, 73 P.3d at 60 (citation and internal quotation marks omitted).  As noted above, Hawai`i law does not require a plaintiff to proffer expert testimony to establish his entitlement to damages for emotional distress.  See, e.g., Campbell, 63 Haw. at 564, 632 P.2d at 1070-71 (noting that medical testimony is not a prerequisite for recovery for emotional distress, and that its absence is "not . . . a bar to recovery"); Black, 2009 WL 4217460, at *9 ("Expert medical testimony is not necessary to award emotional distress damages. . . . A plaintiff is not required to offer corroborating medical evidence in order to establish emotional distress damages." (citations omitted)).

Plaintiff proffered substantial evidence for the jury to find that Defendant's conduct caused him physical harm.  Sec. III, supra.  And the jury also had before it substantial evidence that that physical harm, in turn, caused Plaintiff severe emotional distress.  See, e.g., Day 1 Tr. at 146:23-25 (regarding his symptoms, Plaintiff testifying that "I thought it was always going to be like that for the rest of my life.  It's scary."); id. at 152:22-25, 153:1 ("I almost committed suicide. . . . I didn't want my kids to lose their dad. . . . I need help. . . . I don't feel good."); id. at 153:19-21 ("[T]he first probably 40 days were complete misery, where every single day I woke up, I didn't feel any chance.  I didn't feel like I was ever going to get better."); id. at 154:4-6 ("I just still felt really kind of lifeless, where I didn't have that motivation to live or to do anything. . . . I lost it all."); see also id. at 154:19-25, 155:1-3 (describing getting some relief from his physical symptoms as "the first time that [he] felt like there might be some hope. . . . I wasn't suffering like I was before.").

Moreover, the jury had before it substantial evidence that the incident itself, and not just Haldol's physical effects, caused Plaintiff emotional distress.  See, e.g., id. at 131:9 (Plaintiff testifying that he was "frightened" upon learning he would be given an injection); id. at 133:16-19 ("I

47

didn't know what it was. I never heard of the drug, so I was—I was a little frightened. Not a little. Very frightened."); id. at 150:1 ("I was very depressed"); July 22, 2013 Progress Note ("Mad about getting Haldol D as it caused him some side effects. Has mood swings and when he is down he gets suicidal and feels very bad inside."); Day 4 Tr. at 28:22-25 (testimony of Dr. Goldberg confirming that Plaintiff was distressed about the administration of Haldol). In sum, Plaintiff proffered substantial evidence of causation as to support a finding of liability for IIED.

Defendant's motion for judgment as a matter of law as to Plaintiff's claim for IIED is denied because there is substantial evidence to support the jury's findings of recklessness, outrageousness, and causation.

## IV. There Is Substantial Evidence to Support an Award of Punitive Damages

Defendant argues that it is entitled to judgment as a matter of law as to Plaintiff's claim for punitive damages because Nurse Johns—"the only operative agent of [Defendant] in this case"—lacked the requisite mental state.[18] Mem. in Supp.

---

[18] Additionally, and although Defendant did not raise this issue in its written Rule 50 Motion, counsel expressed concern at argument that "[t]here is no evidence of [Defendant's] financial condition, and therefore no basis on which the jury can make a[ (Continued . . .)

at 19-20.  Given its conclusion that there is substantial

evidence to support a finding that Dr. Elliott was acting as

Defendant's agent, the Court disagrees with Defendant's premise,

and further finds there is substantial evidence to support an

award of punitive damages.

Under Hawai`i law, a plaintiff seeking punitive

damages

> must prove by clear and convincing evidence
> that the defendant has acted wantonly or
> oppressively or with such malice as implies
> a spirit of mischief or criminal
> indifference to civil obligations, or where
> there has been some wil[l]ful misconduct or
> that entire want of care which would raise
> the presumption of a conscious indifference
> to consequences.

Masaki v. Gen. Motors Corp., 71 Haw. 1, 16-17, 780 P.2d 566, 575

(1989) (citation omitted); see also Best Place, Inc. v. Penn Am.

Ins. Co., 82 Haw. 120, 130, 920 P.2d 334, 344 (1996) ("Hawai`i

---

(. . .)
punitive damages] award." Day 4 Tr. at 81:14-21.  But Hawai`i
courts have observed that the paucity or absence of evidence
concerning a defendant's financial condition "'does not
necessarily invalidate a punitive award but only eliminates a
factor [by] which to gauge the reasonableness of the award.'"
Mock v. Castro, 105 Haw. 374, 98 P.3d 245, 2004 WL 1977617, at
*14 (2004) (unpublished table decision) (citing Ditto v.
McCurdy, 86 Haw. 93, 107, 947 P.2d 961, 974 (Ct. App. 1997)).
The Mock court went on to rule that "the amount of punitive
damages is a matter which is peculiarly within the province of
the jury[.]" Mock, 2004 WL 1977617, at *14 (citation omitted).
Moreover, the jury was not wholly without evidence regarding
Defendant's financial condition, as it heard testimony that
Wilcox Memorial Hospital is the "primary major hospital" on the
island of Kaua`i.  Day 3 Tr. at 28:6-9.

allows punitive damages for wil[l]ful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." (citations and internal quotation marks omitted)). "The standard for punitive damages encompasses gross negligence, which is the entire want of care raising the presumption of indifference to consequences." Durham v. Cty. of Maui, 692 F. Supp. 2d 1256, 1262 (D. Haw. 2010) (citations and internal quotation marks omitted); see also Kang v. Harrington, 59 Haw. 652, 663, 587 P.2d 285, 293 (1978) ("The proper measurement of punitive damages should be the degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant" (citations, brackets, and internal quotation marks omitted)); Pancakes of Haw., Inc. v. Pomare Props. Corp., 85 Haw. 286, 293, 944 P.2d 83, 90 (Ct. App. 1997) (defining gross negligence as "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected." (citation and internal quotation marks omitted))).

"'[W]hether to award punitive damages and the determination of the amount are within the sound discretion of the trier of fact, whether judge or jury.'" Lee v. Aiu, 85 Haw. 19, 35, 936 P.2d 655, 671 (1997) (quoting Restatement (Second) of Torts § 908 cmt. (d)).

Here, Plaintiff proffered substantial evidence of Dr. Elliott's conduct, which in sum was sufficient to show wantonness with reckless indifference to Plaintiff's rights and gross negligence by clear and convincing evidence.  Dr. Elliott knew that Plaintiff did not consent to the administration of medication.  See Day 3 Tr. at 17:1-7 (testimony of Nurse Johns). Dr. Elliott never observed any abnormal behavior from Plaintiff. See Day 1 Tr. at 46:20-25, 47:1-17 (testimony of Dr. Elliott); Admission Record at 70.  And Dr. Elliott was aware that his limited authorization in ordering medication was to ensure Plaintiff's safe transport to Mahelona, which was nine miles—a fifteen-to-twenty-five-minute drive—from Wilcox Memorial Hospital. See Day 1 Tr. at 81:20-24 (testimony of Dr. Elliott); HRS § 334-59(a)(3); Day 4 Tr. at 11:21-23 (noting the parties' stipulation to the time and distance of the drive).  He was further aware that, upon Plaintiff's arrival at Mahelona, Dr. Goldberg would have the authority to administer any necessary medication.  See Day 1 Tr. at 78:17-19 (testimony of Dr. Elliott).

And yet Dr. Elliott ordered not just Geodon—which is short-acting and useful for sedation and calming—but also one hundred milligrams of Haldol, which is long-acting and was intended to address "the psychotic-like things" that Dr. Elliott could not confirm Plaintiff had said.  See Day 1 Tr. at 79:7-9

51

(Dr. Elliott testifying that Geodon is a short-acting alternative to Haldol); Day 4 Tr. at 11:13-15 (testimony of Dr. Goldberg as to Geodon's purpose); id. at 16:11-13, 17:11-18 (Dr. Goldberg testifying that he told Plaintiff the Haldol would remain in his system for thirty days); Goldberg Initial Assessment (Dr. Goldberg's notes recording the same); id. at 11:15-17 (testimony of Dr. Goldberg as to Haldol's purpose); Admission Record at 70-71 (recording Dr. Elliott's uncertainty regarding Plaintiff's reportedly bizarre behavior).

Thus, the jury had before it substantial evidence from which it could conclude, by a "clear and convincing" standard, that Dr. Elliott—acting as Defendant's agent, see Sec. I, supra—acted wantonly, with reckless indifference to Plaintiff's rights, and was grossly negligent in exceeding his limited statutory authority, which was not to medicate Plaintiff more than was medically necessary for his safe transportation from Wilcox Memorial Hospital to Mahelona. Masaki, 71 Haw. at 16-17, 780 P.2d at 575; HRS § 334-59(a)(3).

In light of the foregoing, Defendant's motion for judgment as a matter of law as to Plaintiff's claim for punitive damages is denied.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES Defendant Wilcox Memorial Hospital's Motion for Judgment as a Matter of Law, ECF No. 444.  The Clerk of Court is instructed to enter judgment in favor of Plaintiff, in accordance with the jury's verdict.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, April 16, 2019.



Alan C. Kay
Sr. United States District Judge

Raymond v. Wilcox Mem'l Hosp., Civ. No. 15-212 ACK-RLP, Order Denying Defendant Wilcox Memorial Hospital's Motion for Judgment as a Matter of Law.