IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

_____
                                )
CAMERON RAYMOND,                 )
                                )
                 Plaintiff,      )
v.                               )  Civ. No. 15-00212 ACK-WRP
                                )
WILCOX MEMORIAL HOSPITAL,        )
                                )
                 Defendant.      )
_____)


**ORDER DENYING DEFENDANT WILCOX MEMORIAL HOSPITAL'S MOTION FOR A NEW TRIAL AND TO AMEND THE JUDGMENT**

For the reasons discussed below, the Court DENIES Defendant Wilcox Memorial Hospital's Motion for a New Trial and to Amend the Judgment, ECF No. 481.

**BACKGROUND**

For purposes of this Order, the Court will not recount this case's lengthy procedural and factual history beginning in 2015. The Court only discusses those facts of specific relevance to the issues that this Order addresses. Detailed procedural and factual discussions are available in the Court's Order Denying Defendant Wilcox Memorial Hospital's Motion for Judgment as a Matter of Law dated April 16, 2019. See ECF No. 470.

A jury trial on Plaintiff Cameron Raymond's ("Plaintiff") claims against Defendant Wilcox Memorial Hospital ("Defendant") for assault, battery, and intentional infliction

of emotional distress ("IIED") took place on March 13–15 and 20–21, 2019. ECF Nos. 437, 438, 440, 455, and 456. The jury deliberated on March 21 and 22, 2019, ECF Nos. 456 and 461, and returned a verdict in favor of Plaintiff on March 22, 2019. ECF Nos. 461 and 463. The jury found Defendant liable for assault, battery, and IIED, and awarded Plaintiff $722,600, comprising $297,600 in compensatory damages[1] and $425,000 in punitive damages. ECF No. 463. On April 16, 2019, the Court issued an Order Denying Defendant Wilcox Memorial Hospital's Motion for Judgment as a Matter of Law (the "April 16, 2019 Order"). ECF No. 470. Judgment was entered on that same date. ECF No. 471.

On May 14, 2019, Defendant filed the instant Motion for a New Trial and to Amend the Judgment ("Motion"), ECF No. 481, together with a Memorandum in Support ("Mem. in Supp.") thereof.[2] ECF No. 481-1. On May 28, 2019, Plaintiff filed a Memorandum in Opposition to Defendant's Motion ("Mem. in Opp."), ECF No. 486, and on June 10, 2019, Defendant filed its Reply. ECF No. 489. Under the Local Rules of Practice for the United States District Court for the District of Hawai`i, motions for a

---

[1] The jury found that Plaintiff had suffered $22,000 in special damages and $350,000 in general damages, ECF No. 463 at 4, but also found that Plaintiff had failed to mitigate damages in the amount of $74,400. Id. at 7.

[2] Also on May 14, 2019, Defendant filed a Renewed Motion for Judgment as a Matter of Law. ECF No. 483. That motion is addressed in a separate order.

new trial and motions to amend a judgment are non-hearing motions, and the Court finds that a hearing on this Motion is neither necessary nor appropriate.  <u>See</u> L.R. 7.2(e).

## STANDARDS

### I.  Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides that "after a jury trial . . . [t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Rule 59(a)(1)(A).

"Rule 59 does not specify the grounds on which a motion for a new trial may be granted[.]"  <u>Zhang v. Am. Gem Seafoods, Inc.</u>, 339 F.3d 1020, 1035 (9th Cir. 2003).  Instead, the Court is "bound by those grounds that have been historically recognized."  <u>Id.</u>  "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"  <u>Molski v. M.J. Cable, Inc.</u>, 481 F.3d 724, 729 (9th Cir. 2007) (citing <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940)).  The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."

Passantino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d
493, 510 n.15 (9th Cir. 2000).  In ruling on a motion for
a new trial, "the district court has the duty to weigh the
evidence as the court saw it, and to set aside the verdict of
the jury, even though supported by substantial evidence, where,
in the court's conscientious opinion, the verdict is contrary to
the clear weight of evidence" Molski, 481 F.3d at
729 (citations, internal quotation marks, and alterations
omitted).

In other words, in most cases, the judge should accept
the findings of the jury; however, if the judge is left with the
definite and firm conviction that a mistake has been committed,
he may order a new trial:

> On the one hand, the trial judge does not
> sit to approve miscarriages of justice.  His
> power to set aside the verdict is supported
> by clear precedent at common law and, far
> from being a denigration or a usurpation of
> jury trial, has long been regarded as an
> integral part of trial by jury as we know
> it.  On the other hand, a decent respect for
> the collective wisdom of the jury, and for
> the function entrusted to it in our system,
> certainly suggests that in most cases the
> judge should accept the findings of the
> jury, regardless of his own doubts in the
> matter . . . .  If, having given full
> respect to the jury's findings, the judge on
> the entire evidence is left with the
> definite and firm conviction that a mistake
> has been committed, it is to be expected
> that he will grant a new trial.

Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371–72 (9th Cir. 1987) (internal quotation marks and citations omitted). "The judge can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." Id. at 1371. But "the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'" Roy v. Volkswagen of Am., Inc., 896 F.2d 1174, 1176 (9th Cir. 1990) (citation omitted).

## II. Motion to Amend the Judgment

Federal Rule of Civil Procedure 59(e) permits a party to move the court to alter or amend a judgment after its entry. A Rule 59(e) motion may be granted if doing so (1) is necessary to correct a judgment that rests on manifest errors of law or fact; (2) is necessary to present newly discovered or previously unavailable evidence; (3) is necessary to prevent manifest injustice; or (4) if there is an intervening change in controlling law. Allstate Ins. Co. v. Herron, 634 F.3d 1101, 1111 (9th Cir. 2011) (citing McDowell v. Calderon, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999)). A "district court enjoys considerable discretion in granting or denying" a Rule 59(e) motion. McDowell, 197 F.3d at 1255 n.1. However, amendment should be granted sparingly "in the interests of finality and

conservation of judicial resources." <u>Kona Enterprises, Inc. v.</u>
<u>Estate of Bishop</u>, 229 F.3d 877, 890 (9th Cir. 2000).

**DISCUSSION**

**I.    Motion for a New Trial**

Defendant presents six arguments as to why it is
entitled to a new trial, each of which the Court addresses in
turn.

**A. Apportionment of Damages**

Defendant argues that it is entitled to a new trial
because the jury "failed to properly apportion damages to
Plaintiff's pre-existing condition."  Mem. in Supp. at 5-11.
According to Defendant, "there is no way in light of [the jury]
instructions to reconcile the inconsistent findings by the jury
relating to pre-existing injury or condition, and the
aggravation of that pre-existing injury or condition[.]"  <u>Id.</u> at
10.

The jury was instructed to award damages exclusive of
those damages attributable to any pre-existing condition of
Plaintiff's that was unresolved at the time of Defendant's
assault, battery, and IIED:

Jury Instruction No. 27

> A tortfeasor is liable not only for damages
> resulting from direct and unique injuries
> inflicted on the victim, but also for
> damages resulting from the aggravation of
> any pre-existing injury or condition.  A

tortfeasor is not liable for damages attributable solely to a pre-existing injury or condition.

In determining the amount of damages, if any, to be awarded to Plaintiff, you must determine whether Plaintiff had an injury or condition that existed prior to the June 6, 2013 incident.

If you find that Plaintiff was fully recovered from the pre-existing injury or condition at the time of the subject incident, then you should not apportion damages.

If you find that Plaintiff was not fully recovered from the pre-existing injury or condition, you should make an apportionment of damages by determining what portion of the damages is attributable solely to the pre-existing injury or condition and limit your award to:

> (1) the damages attributable to the injury directly and uniquely caused by Defendant; and
> (2) the damages attributable to any aggravation of the pre-existing injury or condition resulting from Defendant's conduct.

If you are unable to determine, by a preponderance of the evidence, what portion of the damages can be attributed to the pre-existing injury or condition, you may make a rough apportionment.

If you are unable to make a rough apportionment, then you must divide the damages equally between the pre-existing injury or condition and the injury caused by Defendant.

Day 5 Tr. at 17:21-25, 18:1-25.

Question 6 on the Verdict Form asked if Plaintiff "suffer[ed] from an injury or condition that existed prior to the assault, battery, and/or intentional infliction of emotional distress[.]" Verdict Form, ECF No. 463, at 5. The jury answered "yes" to this question. Id. Question 7 asked "If so, was the pre-existing injury or condition aggravated by the assault, battery, and/or intentional infliction of emotional distress?" Id. Again, the jury answered "yes" to this question. Id. Question 8 asked the jury to apportion Plaintiff's injury or harm, by percentage, between: (a) his pre-existing injury or condition, if any; (b) aggravation of pre-existing injury or condition, if any; and (c) injury directly and uniquely caused by Defendant. Id. at 6. The jury apportioned zero percent to categories (a) and (b), and apportioned one hundred percent to category (c). Id. The Verdict Form's Question 8 further directed the jury to add the percentages of categories (b) and (c) to reach a total that represented the portion of injury or harm attributable to Defendant; the jury concluded that Defendant was responsible for one hundred percent of Plaintiff's injury or harm. Id.

Plaintiff argues that Defendant waived its objection to this purported inconsistency in the jury's verdict because it failed to object before the jury was discharged. Plaintiff goes on to argue that even if Defendant did not waive its objection,

the jury's verdict is not inconsistent. The Court addresses
these arguments in turn.

### i. Defendant Did Not Waive Its Objection

Waiver depends on whether the Verdict Form at issue
here was a special verdict or a general verdict with answers to
written questions. Federal Rule of Civil Procedure 49 addresses
forms of verdicts, with Rule 49(a) directed at special verdicts
and Rule 49(b) directed at general verdicts with answers to
written questions or interrogatories. Fed. R. Civ. P. 49. A
party waives a claim of inconsistent verdicts based on general
verdicts or general verdicts with written questions under
Federal Rule of Civil Procedure 49(b) if the party does not
timely object to the alleged inconsistency before the jury is
discharged. Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1370
(9th Cir. 1987) (citations omitted). However, this waiver rule
is inapplicable to special verdicts under Federal Rule of Civil
Procedure 49(a). Id.

The line between a special verdict and a general
verdict with written questions is notoriously hard to find.
Compare verdict form in El-Hakem v, BJY Inc., 262 F. Supp. 2d
1139 (D. Or. 2003), aff'd, 415 F.3d 1068 (9th Cir. 2005), which
the Ninth Circuit later denoted as containing "functionally
general verdicts," Williams v. Gaye, 895 F.3d 1106, 1132 n.21
(9th Cir. 2018), and verdict form in O'Phelan v. Loy, No. CIV.

09-00236 ACK, 2011 WL 2006426 (D. Haw. May 23, 2011), aff'd, 497 F. App'x 720 (9th Cir. 2012), which the Ninth Circuit found to have "comprised only factual findings," 497 F. App'x at 721 (citation omitted).

However, "the theoretical distinction between general and special verdicts is that general verdicts require the jury to apply the law to the facts, and therefore require legal instruction, whereas special verdicts compel the jury to focus exclusively on its fact-finding role." Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1031 (9th Cir. 2003) (citation and internal quotation marks omitted). "If the jury announces only its ultimate conclusions, it returns an ordinary general verdict; if it makes factual findings in addition to the ultimate legal conclusions, it returns a general verdict with interrogatories. If it returns only factual findings, leaving the court to determine the ultimate legal result, it returns a special verdict." Id. "[T]he key is not the number of questions on a verdict form, but whether the jury announces the ultimate legal result of each claim." Id.

Here, although the Verdict Form was denoted "Special Verdict Form," it appears likely that the Verdict Form was, in fact, a general verdict form with written questions. This is because the jury's pronouncements were not limited to factual findings, and the Court was not left to determine the ultimate

legal result.  Rather, the jury, having been instructed at

length on the law, concluded that Defendant committed assault,

battery, and intentional infliction of emotional distress, each

of which was the legal cause of damages to Plaintiff, Verdict

Form at 3, and that Defendant was liable to Plaintiff in the

amount of $722,600, id. at 9 (adding figure for "Total

Compensatory Damages for Which [Defendant] is Liable" to

punitive damages to arrive at a "Total Award" of $722,600).

Nevertheless, the Court concludes that the Verdict

Form submitted to the jury was a "Special Verdict Form."  The

Ninth Circuit has observed that "it seems that the form of a

general verdict with interrogatories is virtually

indistinguishable from that of a special verdict."  Floyd v.

Laws, 929 F.2d 1390, 1395 (9th Cir. 1991).  Indeed, "[o]ften

courts are unable to decide whether a verdict is a special

verdict under Rule 49(a) or a general verdict with

interrogatories under Rule 49(b).  Id.  Accordingly, because the

Court referred to the Verdict Form as a "Special Verdict Form,"

and therefore the parties likely operated under the assumption

that Rule 49(a) governed, the Court concludes that the Verdict

form was, indeed, a "Special Verdict Form."  See id. at 1396

("Consequently, as a matter of law, the interrogatories

submitted to the jury in this case constituted a special

verdict, simply because that is what the trial court declared

them to be."). Accordingly, Defendant did not waive its challenge to the jury's purportedly inconsistent findings.

Even if the Court were to conclude that the Verdict Form was a general verdict with written interrogatories, the result would be the same. Defendant does not argue that the jury's response to Questions 6, 7, and 8 are inconsistent with the general verdict holding Defendant liable for assault, battery, and IIED; rather, Defendant contends that "there is no way . . . to reconcile the inconsistent <u>findings</u> by the jury." Mem. in Supp. at 10 (emphasis added). Rule 49(b) mandates resubmission to the jury only where the jury's answers to written questions are inconsistent with each other and the verdict. Fed. R. Civ. P. 49(b)(4). Accordingly, because Defendant does not argue that the jury's answers to written questions were inconsistent with its ultimate verdict finding Defendant liable to Plaintiff, Rule 49(b) waiver would not apply in this case.

### ii. The Jury's Findings on Apportionment of Damages Are Not Inconsistent

"The Seventh Amendment to the Constitution guarantees that 'no fact tried by a jury shall be otherwise re-examined in any Court of the United States' except 'according to the rules of the common law.'" <u>Zhang</u>, 339 F.3d at 1038 (quoting <u>Gallick v. Baltimore & O. R. Co.</u>, 372 U.S. 108, 119 (1963)). In other

words, where the jury undertakes factfinding, it is the Court's duty to attempt to harmonize those facts found with one another "if it is possible under a fair reading of them," and to do so "by exegesis if necessary[.]"  See Gallick, 372 U.S. at 119 (citations omitted).  Only if this is not possible may the court order a new trial.  See id.  Courts are required to consider the consistency of verdicts in light of the jury instructions.  Id. at 120-21.

There are several possible ways, via a fair reading, to harmonize the jury's answers to the Verdict Form's Questions 6, 7, and 8.  The jury may have misinterpreted Question 8, and in particular the portion that required it to apportion damages to the aggravation of Plaintiff's pre-existing injury or condition before assigning liability for that aggravation to Defendant.  Rather than taking the preliminary step of assigning a percentage to the aggravation, the jury may well have simply entered the one-hundred percent figure at which it would have arrived had it first apportioned damages to aggravation, then added that figure to the damage directly and uniquely caused by Defendant.  See Day 5 Tr. at 17:22-25,18:1-2 ("A tortfeasor is liable not only for damages resulting from direct and unique injuries inflicted on the victim, but also for damages resulting from the aggravation of any pre-existing injury or condition.  A

tortfeasor is not liable for damages attributable solely to a pre-existing injury or condition.").

There are other possible explanations. Plaintiff suggests that "the jury may have concluded that Plaintiff had a pre-existing condition, but nevertheless determined that Plaintiff suffered no compensable damages as a result of the pre-existing condition or its aggravation." Mem. in Opp. at 14-15. In other words, the jury might have determined that Plaintiff suffered from a pre-existing condition; that his condition was aggravated by Defendant's conduct; but that the only damages Plaintiff suffered were those resulting from direct and unique injuries inflicted by Defendant. Defendant argues that this interpretation of the jury's answers to Questions 6, 7, and 8 would require a finding that the jury "ignored multiple jury instructions."[3]  Reply at 6. To the contrary, this interpretation is quite consistent with the jury instructions, which required the jury to apportion damages "by determining what portion of the damages is attributable solely to the pre-existing injury or condition." Jury Instr. No. 27. The jury apportioned damages just as it was supposed to, finding that zero-percent of the damages was attributable solely to Plaintiff's pre-existing condition, and further finding that

_____

[3] Defendant does not specify which instructions it feels the jury ignored.

zero-percent of the damages was attributable to Defendant's aggravation thereof.  Moreover, the Court notes that Defendant in fact benefitted from the jury having apportioned zero-percent of the damages to Defendant's aggravation of Plaintiff's pre-existing condition because Defendant would have been liable for any such damages.

Plaintiff offers another explanation.  See Mem. in Opp. at 9-14.  Plaintiff suggests that because the jury was instructed to not award damages attributable solely to a pre-existing injury or condition, the "Total Damages" figure indicated in Verdict Question No. 5 is in fact a post-apportionment figure.  This argument is supported by the Hawai`i Supreme Court's decision in Kato v. Funari. 118 Haw. 375, 191 P.3d 1052 (2008).  In that case, the jury received a jury instruction on the law of apportionment based on the Hawai`i Standard Civil Jury Instructions and substantively identical to Court's Jury Instruction No. 27.  Id. at 1059; see Haw. Rev. Civ. Jury. Instr. 7.3.  The jury, tasked with completing a special verdict form, awarded total damages in the amount of $59,536.55; answered "yes" to a question about whether the plaintiff's injuries were caused by a pre-existing condition; and then answered "90%" to a question asking what percentage of the injuries were caused by the pre-existing condition.  Id. at 1055.  The trial court subsequently reduced the $59,536.55

damages figure by 90-percent and entered judgment accordingly.
Id. at 1056.  The Hawai`i Supreme Court reversed the remittitur,
holding that because the jury was instructed to limit its
damages award to the damages attributable to the defendant's
conduct, the "Total Damages" represented a post-apportionment
figure.  Id. at 1060.

Here, it is reasonable to conclude that the jury found
that Plaintiff's "Total Damages" were $372,000, and consistent
with Jury Instruction No. 27, that this figure did not include
"damages attributable solely to a pre-existing injury or
condition."  Verdict Form Question 5; Jury Instr. No. 27; see
also Myers v. South Seas Corp., 76 Haw. 161, 165, 871 P.2d 1231,
1235 (1994) ("As a rule, juries are presumed to be reasonable
and follow all of the trial court's instructions.").  The jury
then completed Verdict Form Question 8 and indicated that none
of the damages were attributable to Plaintiff's pre-existing
condition (consistent with Jury Instruction No. 27), and that
Plaintiff suffered no damages due to Defendant's aggravation of
Plaintiff's pre-existing condition.[4/]  Accordingly, the Court

_____

[4/] Defendant attempts to distinguish Kato by noting in that case
the jury's apportionment of 90-percent of the plaintiff's
injuries to a pre-existing condition, and therefore the jury's
answers on the special verdict form were consistent.  Reply at
5.  Here, the jury's answers were also consistent—the jury
simply determined that zero-percent of Plaintiff's injuries were
(Continued...)

finds that there at least three reasonable interpretations[5/] of the jury's actions, and Defendant is therefore not entitled to a new trial on the basis of the purported inconsistencies that it has identified.

### B. The Jury's Award of Special Damages Was Proper

Defendant argues that the jury's award of special damages was against the weight of the evidence and that the jury's special damages award of $22,000 cannot be reconciled with any reasonable view of the evidence. Mem. in Supp. at 11–13.

"Special damages are often considered to be synonymous with pecuniary loss and include such items as medical and

due to his pre-existing condition and/or to Defendant's aggravation thereof.
[5/] Plaintiff also suggests that the jury may have determined Plaintiff suffered from a pre-existing condition that was aggravated by Defendant's conduct, but that the jury did not apportion because it determined Plaintiff's pre-existing condition had fully resolved or was dormant or latent at the time Plaintiff was injected with Haldol. Defendant argues that this explanation is implausible because Plaintiff's pre-existing condition caused him to be brought to Defendant in the first place. It defies logic to suggest that the jury found Plaintiff's pre-existing condition was aggravated by Defendant's conduct, but at the same time that he was fully recovered from the pre-existing condition. Although it is true that a defendant is liable for all damages where a plaintiff has "fully recovered from any pre-existing condition or [] such condition was dormant or latent," Montalvo v. Lapez, 77 Haw. 282, 300, 884 P.2d 345, 363 (1994), the jury in this case was not instructed on latency or dormancy. Accordingly, the jury could not have found that Defendant "aggravated a dormant pre-existing condition," Mem. in Opp. at 8, as Plaintiff suggests.

hospital expenses, loss of earnings, and diminished capacity to work." Dunbar v. Thompson, 79 Haw. 306, 315, 901 P.2d 1285, 1294 (Ct. App. 1995). The jury was instructed that "[s]pecial damages are those damages which can be calculated precisely or determined by you with reasonable certainty from the evidence." Day 4 Tr. at 20:11-14; see also Haw. Rev. Civ. Jury Instr. 8.2.

Plaintiff suggests that the jury arrived at the $22,000 figure as follows. Plaintiff testified that in June 2012, he purchased a farm for $250,000 based on a seller financing arrangement. Day 1. Tr. at 93:10-25. Plaintiff testified that he made payments of $1,150 per month until he was ultimately forced to sell the farm for $243,000 in August 2013, fourteen payments after purchasing the farm, due to the side effects of Haldol and his related depression.[6/] Day 1 Tr. at 94:1-2, 149:25, 150:1-25, 151:1-25, 152:1-3. Plaintiff's testimony was unrebutted. Thus, Plaintiff's argument goes, Plaintiff suffered a loss of $7,000 when he was forced to sell the farm ($250,000 minus $243,000), as well as a loss of $16,100 ($1,150 times 14 months) in financing payments, for a total loss

_____

[6/] Defendant makes various assertions regarding a lack of evidence as to the ownership of the property, the terms of the financing agreement, and the reasons Plaintiff was forced to sell the property. See Mem. in Supp. at 12; Reply at 9. The fact remains, however, that Plaintiff testified as to the foregoing, and his testimony was unrebutted. Defendant's attempts to undermine Plaintiff's testimony, where no contradictory evidence was presented at trial, are unavailing.

of $23,100 ($7,000 plus $16,100).  The Court finds that this is a reasonable explanation regarding how the jury might have calculated its special damages award, and that the award was determined with reasonable certainty based on the evidence.

There is at least one additional explanation. Plaintiff also testified that he earned $70,000–$100,000 per year working for his family's business, exclusive of bonuses. Day 1 Tr. at 91:11–16.  This employment ended prior to the incident.  See Day 2 Tr. at 13:4–7.  However, Plaintiff started working for his family's business again approximately sixty days after the incident occurred.  Day 2 Tr. at 13:21–25.  The jury might have found that if not for the incident, Plaintiff might have begun working for his family's business two months earlier. Thus, the jury might have found that Plaintiff was entitled to $7,500 per month for the two months that he was not working (assuming a $90,000 per year salary in the $70,000–$100,000 range that Plaintiff testified about), plus the $7,000 loss Plaintiff incurred when he sold his farm.  Day 1 Tr. at 152:2–4. This would yield a total special damages award of $22,000 ($15,000 plus $7,000).  As to the fourteen monthly payments of $1,150, the jury might have concluded Plaintiff was not entitled to recoup his financing payments because he enjoyed the use of the farm during those fourteen months.

For the foregoing reasons, the Court finds that there are at least two possible explanations by which the jury might have calculated its special damages award of $22,000, and that the special damages award was therefore calculated with reasonable certainty from the evidence. Accordingly, the special damages award was not against the clear weight of the evidence and Defendant is not entitled to a new trial on this basis.

### C. The Jury's Verdict Regarding Mitigation of Damages Was Proper

The jury found that Plaintiff had failed to use reasonable efforts to mitigate damages and reduced its award by $74,400. Verdict Form at 7. Defendant argues that the jury's verdict regarding mitigation of damages was against the weight of the evidence, and "did not go far enough," because there was evidence that Plaintiff did not take a prescribed medication (Cogentin) that would have resolved the extrapyramidal side effects of Haldol. Mem. in Supp. at 13–15. Defendant argues that Plaintiff's "deliberate decision . . . allowed his injuries to persist and compound his alleged emotional injuries." Id. at 15.

It is "the well-settled principle in this jurisdiction that the proper amount of damages to be awarded is within the exclusive province of the jury, since jurors are the sole judges

of all disputed questions of fact." <u>Kato</u>, 118 Haw. at 381, 191
P.3d at 1058 (citation, alterations, and internal quotation
marks omitted).  Moreover, "[t]he reasonableness of a
plaintiff's efforts to mitigate is a question of fact for jury
determination." <u>Jackson v. Shell Oil Co.</u>, 702 F.2d 197, 202
(9th Cir. 1983).  The Court finds that the jury's mitigation of
damages was not against the clear weight of the evidence.  The
jury could well have concluded: that Plaintiff's decision not to
take Cogentin was not wholly unreasonable, given the fact that
his injuries were traceable to the involuntary administration of
other medication; that Plaintiff was experiencing side effects
other than extrapyramidal side effects, including inability to
tolerate interaction with his children and pain throughout his
body; and/or that the emotional injuries Plaintiff suffered from
the administration of Haldol comprised injuries beyond those
that would have been redressed by the abatement of his
extrapyramidal side effects.

Moreover, the jury, in reducing Plaintiff's total
damages award of $372,000 by $74,400, apparently weighed the
evidence just as it was supposed to.  For example, Plaintiff
testified that the medications Dr. Harold Goldberg prescribed
him actually made him feel sick.  Day 1 Tr. at 150:2-5.
Plaintiff in fact testified that he finally began to feel better
after he stopped taking the medications Dr. Goldberg prescribed—

testimony which was later corroborated by Dr. Goldberg's testimony. Day 1 Tr. at 153:10-13, 154:13-25, 155:1-12 (Plaintiff testified that he felt better after he stopped taking his medication); Day 4 Tr. at 35:5-9, 76:8-14 (Dr. Goldberg testified that Plaintiff was not taking the drugs prescribed to him and that he still got better).

Accordingly, the Court finds that the jury's mitigation of damages was not against the clear weight of the evidence, and Defendant is therefore not entitled to a new trial on this basis.

### D. Punitive Damages

Defendant argues that the jury's award of punitive damages was improper (1) because the punitive damages award was against the clear weight of the evidence; and (2) because no evidence was presented at trial that Defendant approved, authorized, or ratified Dr. Chris Elliott's conduct. Alternatively, Defendant argues that the punitive damages award is grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and requests that the Court remit the punitive damages award to a 1:1 ratio of punitive-to-compensatory damages. The Court addresses each argument in turn.

### i.   There Was Substantial and Clear and Convincing Evidence for the Jury's Award of Punitive Damages

"The proper measurement of punitive damages should be the degree of malice, oppression, or gross negligence which forms the basis for the award and the amount of money required to punish the defendant." Kang v. Harrington, 59 Haw. 652, 663, 587 P.2d 285, 293 (1978) (citation, internal quotation marks, and alterations omitted); see also Ditto v McCurdy, 86 Haw. 84, 92, 947 P.2d 952, 960 (1997) ("the jury needed only to find either willful misconduct or entire want of care, to wit, gross negligence, in order to properly award punitive damages") (emphasis in original); Best Place, Inc. v. Penn Am. Ins. Co., 82 Haw. 120, 130, 920 P.2d 334, 344 (1996) ("Hawai`i allows punitive damages for wil[l]ful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." (citations and internal quotation marks omitted)).

Defendant argues that punitive damages should not have been imposed because there was no evidence that Dr. Elliott engaged in conscious wrongdoing. See Mem. in Supp. at 15–20. But Defendant misstates the standard applicable to the imposition of punitive damages. Although it is true that the Kang court cited Ress v. Rediess, 130 Colo. 572, 580, 278 P.2d 183, 187 (1954), with approval, and quoted the language

Defendant cites in its Motion, Mem. in Supp. at 16; see also Kang, 59 Haw. at 662, 587 P.2d at 292 the quoted language does not iterate the standard applicable in Hawai`i.

In Kang, the Hawai`i Supreme Court described briefly the Colorado Supreme Court's decision in Ress and noted that the defendants in that case "'acted with, and were prompted by, a proper motive, looking more to the benefit of plaintiff and society, and not through any purpose of injury to plaintiff.'" 59 Haw. at 662, 587 P.2d at 292 (quoting Ress, 130 Colo. At 580; 278 P.2d at 187).  The Kang court then noted that Ress was inapplicable and punitive damages were appropriate because the defendant in Kang did not act in good faith.  Id.  The Kang court did not go so far as to rule that punitive damages are disallowed where, in essence, the tortfeasor acted in good faith.  Moreover, the 1978 Kang decision appears to be the only Hawai`i case to discuss this purported good faith exception to punitive damages awards.

Courts applying Hawai`i law have consistently held that, in addition to intentional wrongdoing, conduct that is wanton, grossly negligent, and/or undertaken with reckless indifference to the rights of others can appropriately lead to punitive damages.  See, e.g., Durham v. Cty. of Maui, 692 F. Supp. 2d 1256, 1262 (D. Haw. 2010); Best Place, 82 Haw. at 130, 920 P.2d at 344; Quedding v. Arisumi Bros., 66 Haw. 335, 340,

661 P.2d 706, 710 (1983); <u>Goo v. Cont'l Cas. Co.</u>, 52 Haw. 235, 239, 473 P.2d 563, 566 (1970); <u>Bright v. Quinn</u>, 20 Haw. 504, 512 (1911). Nevertheless, Defendant repeatedly emphasizes that evidence of conscious wrongdoing is required to impose an award of punitive damages. Mem. in Supp. at 16; Reply at 13. Defendant again misstates the standard, which permits punitive damages awards "where the wrongdoer has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations; or where there has been some wil[l]ful misconduct <u>or that entire want of care which would raise the presumption of a conscious indifference to consequences</u>." <u>Masaki v. Gen. Motors Corp.</u>, 71 Haw. 1, 13, 780 P.2d 566, 573 (1989) (emphasis added, citation and internal quotation marks omitted); <u>Best Place</u>, 82 Haw. at 134, 920 P.2d at 348 (same); <u>Ditto</u>, 86 Haw. at 92, 947 P.2d at 960 (affirming the jury's punitive damages award where clear and convincing evidence indicated that the Defendant was "grossly negligent and therefore reckless and consciously indifferent to the consequences that could arise"). Accordingly, an award of punitive damages does not require evidence of conscious wrongdoing under Hawai`i law and is permitted where there is clear and convincing evidence of gross negligence.[7/]

---

[7/] The Court, in its April 16, 2019 Order, explained the proper
(Continued...)

As the Court explained in its April 16, 2019 Order, the record is replete with evidence of Dr. Elliott's conduct, which was sufficient to establish wantonness with reckless indifference to Plaintiff's rights and gross negligence by clear and convincing evidence. See April 16, 2019 Order at 51-52 (recounting the evidence concerning Dr. Elliott's conduct). The Court briefly reiterates that, notwithstanding Judge Edmund Acoba's order and the MH-4 hold, there was sufficient evidence in the record for the jury to conclude that Dr. Elliott's administration of one hundred milligrams of Haldol was not medically necessary for Plaintiff's safe transfer to Mahelona.[8]

standard for punitive damages under Hawai`i law and determined that there was clear and convincing evidence to support the jury's award of punitive damages due to Dr. Elliott's conduct. See April 16, 2019 Order at 48-52.

[8] HRS § 334-59 provides, in subsection (a), three ways by which emergency admission to a licensed psychiatric facility may be initiated. The relevant provision of the statute states:

> Any licensed physician, advanced practice registered nurse, physician assistant, or psychologist who has examined a person and has reason to believe the person is:
>> (A) Mentally ill or suffering from substance abuse;
>> (B) Imminently dangerous to self or others; and
>> (C) In need of care or treatment;
> May direct transportation, by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A licensed physician, an advanced practice registered nurse, or physician assistant may administer treatment as is medically

(Continued...)

Specifically, Nurse Johns testified that Plaintiff received Haldol to address his psychological stability and not for the purpose of safely transporting him to Mahelona. Day 3 Tr. at 43:23-25. Dr. Goldberg testified that it was his understanding Plaintiff was administered Geodon in order to calm him down and effect his safe transport to Mahelona, while Plaintiff was administered Haldol in order to address psychotic symptoms. Yet Dr. Elliott nevertheless instead chose to administer one hundred milligrams of Haldol for the same "psychotic symptoms" which were meant to be treated at the Mahelona psychiatric facility. Day 4 Tr. at 72:15-25, 73:1-2. Dr. Goldberg confirmed "those were the same symptoms that he was specifically being taken to Mahelona to address." Day 4 Tr. at 72:25, 73:1-2. Finally, Madeline Hiraga-Nuccio, a psychiatric social worker who helped obtain the MH-4 order from Judge Acoba, testified that Judge Acoba's order did not specifically authorize the administration of medication, Day 3 Tr. at 74:16-20, 76:11-15 (although the administration of treatment as was "medically necessary" for

---

necessary, for the person's safe transportation. A licensed psychologist may administer treatment as is psychologically necessary.

HRS § 334-59(a)(3). The Court reiterates that Defendant bore the burden of proof to establish this affirmative defense with evidence sufficient to demonstrate that the administration of Haldol was medically necessary for Plaintiff's safe transportation to Mahelona. See Jury Instr. No. 26.

Plaintiff's safe transportation to Mahelona was nonetheless authorized by statute, <u>see</u> Haw. Rev. Stat. § 334-59(a)(3)). Accordingly, the jury's award of punitive damages was supported by substantial and clear and convincing evidence.

### ii. There Was Substantial and Clear and Convincing Evidence that Defendant Authorized, Approved, and Ratified Dr. Elliott's Conduct

Defendant also argues that the jury's award of punitive damages was against the weight of evidence because there was no evidence presented at trial that Defendant, expressly or impliedly, authorized, approved, or ratified Dr. Elliott's conduct.  Mem. in Supp. at 20-21.

Defendant is correct that "no liability for punitive damages will attach to the principal unless the agent-malfeasor's conduct is shown to be authorized or approved or ratified by the principal."  <u>Lauer v. Young Men's Christian Ass'n of Honolulu</u>, 57 Haw 390, 402, 557 P.2d 1334, 1341 (1976); <u>see also</u> <u>Kealoha v. Halawa Plantation</u>, 24 Haw. 579, 588-89 (1918) ("But however wicked the servant may have been, where the principal neither expressly nor impliedly authorized or ratified the act the criminality of it is as much against him as against any other member of society."); Restatement (Second) of Torts § 909 (1979).  In Hawai`i, "punitive . . . damages . . . [a]re not to be allowed as against the principal unless the principal participated in the wrongful act of the agent, expressly or

impliedly, by his conduct authorizing it or approving it either before or after it was committed." Kealoha, 24 Haw. at 589 (citing Lake Shore & M.S. Ry. Co. v. Prentice, 147 U.S. 101 (1893)).  Defendant, in recognizing this rule, argues that there was no evidence introduced at trial demonstrating that Defendant authorized, approved, or ratified, either expressly or impliedly, Dr. Elliott's conduct.  But Defendant is mistaken for two reasons.

First, the Court finds that there was substantial and clear and convincing evidence for the jury to conclude that Defendant impliedly authorized Dr. Elliott's actions because of his position working in the emergency room of Wilcox Memorial Hospital.  Punitive damages can properly be awarded against a principal because of an act by an agent where "the principal participated in the wrongful act of the agent, expressly or impliedly, by his conduct authorizing it." Kealoha, 24 Haw. at 589; see also Lake Shore & M.S. Ry. Co., 147 U.S. at 114.  Dr. Elliott himself testified that his work at Wilcox Memorial Hospital involved "running [Defendant's] 20-bed emergency room," Day 1 Tr. at 9:4, which involved "very frequently" working with a psychiatric social worker to assess and treat patients pursuant to HRS § 334-59(a) (Hawai`i's emergency examination and hospitalization statute).  Day 1 Tr. at 67:12-25, 68:1-3. Relatedly, Dr. Elliott's work required ordering psychotropic

medications for such patients and ordering Defendant's nurse
employees to administer medications accordingly.  Day 1 Tr. at
37:1-6, 67:12-25, 68:1-3 (testimony of Dr. Elliott); <u>see also</u>
Day 3 Tr. at 17:1-16, 18:11-25 (testimony of Nurse Johns).  Dr.
Elliott also testified that the nurses working at Wilcox
Memorial Hospital took instruction from him.  Day 1. Tr. at
33:1-3 (testimony of Dr. Elliott); Day 3 Tr. at 12:16-25, 13:1-
5, 17:1-7 (testimony of nurse Johns).  Nurse Johns also
testified as to Dr. Elliott's authority to order and administer
drugs to patients.  Day 3 Tr. at 30:9-13.  The Court finds that
the foregoing serves as sufficient evidence for the jury to
conclude that Dr. Elliott's actions were impliedly authorized by
Defendant, and punitive damages are therefore permissible.

Second, as Plaintiff points out in his Opposition,
Defendant admitted into evidence a letter dated January 27, 2014
from Kathy Clark, then President and CEO of Defendant, addressed
to Plaintiff.  Day 4 Tr. at 121:10-16; Defendant's Exhibit 30,
ECF No. 486-15.  The parties stipulated to the authenticity and
admissibility of the letter, ECF No. 435, which was "written in
follow-up to complaints received regarding [Plaintiff's]
Emergency Department visit of June 5, 2013."  Defendant's
Exhibit 30.

Therein, Ms. Clark considered Dr. Elliott's
administration of Haldol to Plaintiff and wrote "I had your

medical record and the care you were provided by the Emergency Physician reviewed by our quality physician." Id. Ms. Clark then wrote that it was determined "your condition required administration of a medication (Haldol) in order to address your symptoms and to effect your transfer to Mahelona for further care. Id. Finally, Ms. Clark stated that "it is my determination that the care you received was appropriate, and we consider this matter closed." Id. (emphasis added). In other words, Ms. Clark expressly approved of and ratified Dr. Elliott's conduct—she even apologized at the end of the letter, stating "[w]e regret your experience here at Wilcox Memorial Hospital was not acceptable to you and we appreciate your feedback."[9/] Id.; see Lauer, 57 Haw. 390 at 402, 557 P.2d at 1341 (iterating the rule that a punitive damages award against a principal is permitted only if the principal "authorized or approved or ratified" the agent's misconduct). Moreover, although "[t]he general rule is that there can be no ratification without knowledge of the material facts," Kahanamoku v. Advertising Publishing Co., 26 Haw. 500, 502 (1922), here, the letter indicates that Defendant's then-

---

[9/] In its Reply, Defendant characterizes the letter as "nothing more than a denial of liability." Reply at 14. This argument is not supported by the text of the letter, which makes no mention of liability. Nor does the letter state that Defendant is not responsible for Dr. Elliott's conduct. Accordingly, Defendant's argument is without merit.

President and CEO had Plaintiff's medical record and care
reviewed by Defendant's quality physician, and thus Defendant
clearly had sufficient knowledge of the material facts as to
constitute ratification of Dr. Elliott's conduct.

Because the letter not only ratifies, but expressly
approves Dr. Elliott's conduct, Hawai`i law permits the
imposition of punitive damages. Moreover, the Court finds that
the letter serves as substantial and clear and convincing
evidence that Dr. Elliott acted within the scope of his
authority as Defendant's agent when he ordered Nurse Johns to
inject Plaintiff with Haldol—the act that forms the basis of
Plaintiff's assault, battery, and IIED claims. Accordingly, the
Court finds that Defendant's argument is without merit, and the
jury's award of punitive damages was supported by substantial
and clear and convincing evidence.[10]

---

[10] The Court briefly addresses Defendant's argument that
Plaintiff is not entitled to punitive damages because there was
no evidence presented that Defendant had improper policies,
protocols, or procedures in place, or a pattern of corporate
misconduct that would support an award of punitive damages.
Mem. in Supp. at 20. Although evidence indicating a pattern of
corporate misconduct can support a punitive damages award, the
lack of such evidence does not foreclose the imposition of
punitive damages. See, e.g., Masaki v. Gen. Motors. Corp., 71
Haw. 1, 3, 780 P.2d 566, 569 (1989) (permitting a punitive
damages award against a manufacturer based on a single
incident). Accordingly, the fact that this was a single
incident has no bearing on the Court's punitive damages
analysis.

### iii.  The Punitive Damages Award Does Not Violate the Due Process Clause of the Fourteenth Amendment

Finally, Defendant argues that the punitive damages award is grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Mem. in Supp. at 21–22.  Defendant requests that the Court reduce the punitive damages award to a 1:1 ratio of punitive-to-compensatory damages.  Id. at 21.

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003) (citations omitted).  Courts reviewing punitive damages awards are to consider three guideposts when determining whether an award violates a defendant's procedural due process rights: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  Id. at 418; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996).

Defendant does not address the Campbell guideposts in its Motion; instead, Defendant argues that the Court should reduce the jury's punitive damages award to a 1:1 ratio because

the emotional distress Plaintiff was compensated for derives from the same conduct as the punitive damages award, Mem. in Supp. at 22, citing this Court's decision in Casumpang v. Int'l Longshore & Warehouse Union, Local 142 in support of its argument.  See 411 F. Supp. 2d 1201, 1219-22 (D. Haw. 2005).  However, the Court must consider the Campbell guideposts in determining whether Defendant's remittitur request is meritorious.

　　　　To determine the degree of reprehensibility of a defendant's conduct, courts consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."  Campbell, 538 U.S. at 419.  Going through these factors, the Court finds that Plaintiff suffered significant physical harm (as well as a degree of economic harm) as a result of Defendant's conduct through its agent Dr. Elliott; Defendant's conduct certainly evinced a reckless disregard of Plaintiff's health and safety; it does not appear that Plaintiff was significantly financially vulnerable; this appears to have been an isolated incident; and finally, the harm was not the result of intentional malice,

trickery, or deceit (however, there is significant evidence to conclude, as the jury evidently did, that Defendant's conduct was reckless and grossly negligent).  On balance, and particularly in light of the ratio as discussed below, the Court finds that Defendant's conduct was sufficiently reprehensible to warrant the imposition of a $425,000 punitive damages award.

As for the second Campbell guidepost, the ratio of punitive damages to compensatory damages involved here is 1.14:1 ($425,000 punitive damages award to $372,000 compensatory damages award).  The Court finds that a ratio of 1.14:1 is exceedingly reasonable.  Defendant urges the Court to reduce the punitive damages award to achieve a 1:1 ratio as this Court did in Casumpang.  In that case, the Court reduced a punitive damages award from $1 million to $240,000.  However, Casumpang is not instructive here for two reasons.  First, Casumpang involved a punitive damages award against a union, and as the Court noted, the United States Supreme Court "has cautioned that punitive damages against unions should not 'compromise[] the collective interests of union members in protecting limited funds.'"  411 F. Supp. 2d at 1218–19 (quoting Int'l Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 50 (1972)).  Although Defendant argues the punitive damages concerns applicable to unions also apply to hospitals, Reply at 15, Defendant has not identified any authorities in support of its public policy

argument, and the Court knows of none.  Second, the punitive

damages award in Casumpang of $1 million was more than four

times the amount of compensatory damages (which were $240,000),

441 F. Supp. 2d at 1222, and the Supreme Court has stated that a

punitive damages award of more than four times the amount of

compensatory damages "might be 'close to the line . . . of

constitutional impropriety.'"  See Gore, 517 U.S. at 581

(quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24

(1991)).  Unlike the 4:1 ratio involved in Casumpang, this case

involves a punitive-to-compensatory-damages ratio of only 1.14:1

($425,000 punitive damages award to $372,000 compensatory

damages award).

As for the final Campbell guidepost, the Court is

unaware of any legislative sanctions under Hawai`i law for

comparable misconduct.  Accordingly, this factor appears to be

inapplicable to the instant case.

For the foregoing reasons, the Court finds that the

jury's punitive damages award is reasonable and not so grossly

excessive as to violate the Due Process Clause of the Fourteenth

Amendment.  Therefore, Defendant's request for remittitur is

denied.

### E. Substantial and Clear and Convincing Evidence Supports a Finding of Liability for IIED

Defendant argues that the jury's verdict finding Defendant liable for IIED was against the clear weight of the evidence because "Dr. Elliott acted within his proper medical judgment to order treatment he believed was necessary to transport Plaintiff safely to Mahelona." Mem. in Supp. at 23. The Court already addressed this argument at length in its April 16, 2019 Order. As the Court noted, a plaintiff asserting a claim for IIED must establish "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress" to him. Hac v. Univ. of Hawai`i, 102 Haw. 92, 106–07, 73 P.3d 46, 60–61 (2003). The Court discussed in detail the evidence in the record supporting each of the aforesaid elements of IIED, and therefore, the jury's conclusion that Defendant was liable for IIED. See April 16, 2019 Order at 38–48. In short, the Court found that there was substantial evidence to support the jury's findings of recklessness, outrageousness, and causation. Id. at 48. Rather than repeat that analysis here, the Court will address two points raised by Defendant in its Motion.

First, Defendant argues that Dr. Elliott's decision to administer Plaintiff Haldol for purposes of transporting him to

Mahelona was an appropriate exercise of his medical judgment in light of Judge Acoba's order.[11/]  Mem. in Supp. at 23.  But based upon the evidence in the record, the jury apparently concluded that the administration of Haldol was not medically necessary for Plaintiff's safe transportation to Mahelona, and therefore was not within the authority of HRS § 334-59(a)(3).  Defendant argues that the jury "improperly substituted its judgment for the medical judgment of a physician in the absence of any testimony that such judgment far exceeded the bounds of the standard of care and proper medical judgment."  Mem. in Supp. at 24.  Here, as elsewhere, Defendant attempts to import elements from a medical negligence claim and argue that testimony concerning the standard of care is required for a finding of liability.  Accordingly, the Court finds that Defendant's argument is without merit.

As the Court noted in its April 16, 2019 Order, substantial evidence supports the jury's conclusion that the administration of Haldol was not medically necessary for Plaintiff's safe transport to Mahelona, and thus did not come

---

[11/] As the Court noted previously, Judge Acoba's order did not specifically authorize the administration of medication.  See Day 3 Tr. at 74:16-20, 76:11-15 (testimony of psychiatric social worker Hiraga-Nuccio).  Nevertheless, the administration of treatment as was "medically necessary" for Plaintiff's safe transport to Mahelona was authorized by statute.  See Haw. Rev. Stat. § 334-59(a)(3).

within the authority of HRS § 334–59(a)(3).  See, e.g., Day 3
Tr. at 43:23–25 (testimony of Nurse Johns that it was his
understanding Plaintiff was administered Haldol for his
"psychological stability" and not for his safe transport to
Mahelona); Day 4 Tr. at 11–17 (testimony of Dr. Goldberg that
Plaintiff was given Geodon "primarily to calm him and sedate him
and make him easier to transport[,]" while Plaintiff was given
Haldol "specifically for the psychotic-like things that he had
been saying.").  The Court also reiterates that Defendant
expressly approved of and ratified Dr. Elliott's conduct, which
indicates that Dr. Elliott acted within the scope of his
authority as Defendant's agent when he ordered Nurse Johns to
inject Plaintiff with one hundred milligrams of Haldol.  See
Defendant's Exhibit 30 (letter from Defendant's then-President
and CEO addressed to Plaintiff stating "it is my determination
that the care you received was appropriate").

Second, and relatedly, Defendant argues in a footnote
that "the [C]ourt erred in precluding Dr. Elliott from
testifying as to why he chose to give Plaintiff both Geodon and
Haldol."  Mem. in Supp. at 24 n.3.  In other words, Defendant
argues that Dr. Elliott should have been permitted to testify as
to the standard of care in order to establish that injecting
Plaintiff with both Geodon and Haldol were medically necessary
for his safe transport to Mahelona.  Defendant's argument is

without merit because if Dr. Elliott were permitted to testify regarding the foregoing, such testimony would have constituted expert testimony based upon Dr. Elliott's specialized knowledge as a physician.  See Fed. R. Evid. 702.  Defendant failed to timely disclose Dr. Elliott as an expert witness pursuant to Federal Rule of Civil Procedure 26(a)(2) ("a party must disclose to other parties the identity of any witness it may use to present evidence under Federal Rule of Evidence 702, 703, or 705").  Fed. R. Civ. P. 26(a)(2)(A).  Treating physicians and other healthcare professionals testifying as to opinions formed during the course of treatment are "experts" regarding whose testimony the Rule 26(a)(2)(C) disclosures are required.  See Republic of Ecuador v. Mackay, 742 F.3d 860, 865 n.1 (9th Cir. 2014); Fed. R. Civ. P. 26(a)(2)(C) Advisory Committee's note to 2010 amendment ("A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705.  Frequent examples include physicians or other health care professionals . . . . Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C).").  Accordingly, Dr. Elliott was precluded from offering testimony with a basis in scientific or other specialized knowledge, including all medical opinions and explanations as to why he undertook certain treatment decisions.

Precluding Dr. Elliott from testifying as an expert was not
error and is not grounds for a new trial.

### F. Jury Instruction No. 16—Implied Actual Authority

Defendant argues that Jury Instruction No. 16
incorrectly stated the applicable law, arguing that "there is no
such thing . . . in the context of hospitals and patient care as
implied actual authority and there are no cases setting forth
such a standard." Mem. in Supp. at 26.

Jury Instruction No. 16

Actual authority may be created by express
agreement or implied from the conduct of the
parties.

To establish express actual authority,
Plaintiff must prove an oral or written
agreement between Defendant and the agent
which includes all of the following:

(1) Defendant has delegated authority to the
agent; and
(2) The agent has accepted that authority;
and
(3) The agent is authorized to do certain
acts.

To establish implied actual authority,
Plaintiff must prove both of the following:

(1) Conduct by Defendant, including
acquiescence, which is communicated directly
or indirectly to the agent; and
(2) A reasonable belief by the agent based
on such conduct that Defendant desired the
agent to perform certain acts for Defendant.

Acquiescence is a silent appearance of
consent and occurs where the principal knows

that the agent is acting on the principal's
behalf and takes no action to object.[12/]

Day 5 Tr. at 13:14-25, 14:1-7.

### i. Defendant Waived Its Objection to Jury Instruction No. 16

Federal Rule of Civil Procedure 51 requires courts to "give the parties an opportunity to object" to jury instructions "on the record and out of the jury's hearing before the instructions and arguments are delivered." Fed. R. Civ. P. 51(b)(2). Rule 51 further provides that "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). An objection is timely if "a party objects at the opportunity provided under Rule 51(b)(2), Fed. R. Civ. P. 51(c)(2)(A). Where an objection is untimely, the jury instruction is reviewed for plain error. Fed. R. Civ. P. 51(d)(2). An objection to a jury instruction "must be sufficiently specific to bring into focus the precise nature of the alleged error." Voohries-Larson v. Cessna Aircraft Co., 241 F.3d 707, 713 (9th Cir. 2001) (citing Palmer v. Hoffman, 318 U.S. 109, 119 (1943)). Unless the district court is "alerted to the exact nature of the

---

[12/] Jury Instruction No. 17 instructed the jury on apparent authority, a third theory of agency. Day 5 Tr. at 14:8-25, 15:1-2. Defendant's Motion does not address Jury Instruction No. 17.

disagreement," the objection is waived.  <u>Voohries-Larson</u>, 241

F.3d at 715; <u>see also</u> <u>Prendeville v. Singer</u>, 115 F. App'x 303,

306 (9th Cir. 2005).

The Court held a status conference on March 19, 2019

at which it heard the parties' objections to the Court's

proposed jury instructions.  ECF No. 452.  Defendant objected to

Jury Instruction 16, stating "agency principles do not apply in

this case.  There is no evidence that Dr. Elliott was an agent

of Wilcox [Memorial Hospital].  There was no contract."  March

19, 2019 Status Conf. Tr. at 6:17-22.  Defendant went on to

explain "we are objecting to Jury Instruction No. 16 as being

inapplicable to the facts of this case," to which the Court

replied "Okay.  Your objection is noted and overruled."  March

19, 2019 Status Conf. Tr. at 7:1-5.

Defendant thus objected to Jury Instruction 16 on two

grounds: (1) that there was no evidence that Dr. Elliott was an

agent of Defendant; and (2) that Jury Instruction No. 16 was

inapplicable to the facts of this case.  These are not the

objections that Defendant now raises in its Motion; rather,

Defendant now argues that Jury Instruction No. 16 incorrectly

stated the applicable law because implied actual authority does

not exist in the context of hospital and patient care.

The Court finds that Defendant's objection at the

March 19, 2019 status conference in no way alerted the Court "to

the exact nature of the disagreement," <u>Voorhies-Larson</u>, 241 F.3d at 715, with Jury Instruction No. 16. Moreover, as Plaintiff points out, Defendant submitted a "Proposed Alternate Instruction" to Plaintiff's Proposed Jury Instruction No. 3A "Agency – Actual Authority." <u>See</u> Defendant's Objections to Plaintiff's Proposed Jury Instructions at 11–13, ECF No. 393. Defendant's Proposed Alternate Instruction is the exact instruction on express and implied actual authority that the Court ultimately adopted and submitted to the Jury as Jury Instruction No. 16. It is improper for Defendant to object to Jury Instruction No. 16 when it in fact submitted that same instruction as a proposed alternate instruction. <u>Smith v. City of Oakland</u>, 379 Fed. App'x 647, 649 (9th Cir. 2010) (noting judicial estoppel barred a party from objecting to a standard that was incorporated in the party's own proposed jury instruction); <u>Sanghvi v. City of Claremont</u>, 328 F.3d 532, 541 (9th Cir. 2003) (noting that a party waived its challenge to a jury instruction by failing to properly object under Rule 51 and because the party requested an alternative instruction incorporating the standard they sought to challenge). For these reasons, the Court finds that Defendant waived its present challenge to Jury Instruction No. 16.

### ii. Jury Instruction No. 16 on Implied Actual Authority Was Proper

Where a party has failed to properly preserve an objection to a jury instruction under Rule 51, courts "may consider a plain error in the instructions." Fed. R. Civ. P. 51(d)(2). "When reviewing civil jury instructions for plain error, we must consider, as we do in the criminal context, whether (1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights." C.B. v. City of Sonora, 769 F.3d 1005, 1017 (9th Cir. 2014) (citations omitted). The Ninth Circuit has emphasized that "the decision whether to correct a plain error under Federal Rule of Civil Procedure 51(d)(2) is discretionary." Id. at 1018. Thus, courts should exercise their discretion to correct errors under Rule 51(d)(2) "only if review is needed to prevent a miscarriage of justice, meaning that the error seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Id. (citations omitted).

The Court finds that its instruction was not plain error; and, rather, that it was proper and correct. Although it appears there are no Hawai`i cases in which implied actual authority has been applied in the context of hospitals and patient care, Hawai`i law recognizes the theory of implied actual authority in a variety of contexts. See Cho Mark

<u>Oriental Food, Ltd. v. K & K Intern.</u>, 73 Haw. 509, 515–16, 836 P.2d 1057, 1061–62 (1992) (recognizing express actual authority, implied actual authority, and apparent authority as viable theories of agency in the context of a landlord-tenant dispute); <u>Wong Wong v. Honolulu Skating Rink</u>, 24 Haw. 181, 191 (1918) (recognizing implied actual authority in the context of a dispute involving a mechanic's lien); <u>State of Hawai`i v. Hoshijo ex rel. White</u>, 102 Haw. 307, 318, 76 P.3d 550, 561 (2003) (recognizing express actual authority, implied actual authority, and apparent authority as viable theories of agency, but ultimately finding that a student manager (who was not an employee) was an agent of the University of Hawai`i by virtue of an express agreement); <u>see also</u> Haw. Rev. Civ. Jury Instr. 15.18 (setting forth the applicable Hawai`i law on implied actual authority).

More importantly, however, there is case law in several other states recognizing the theory of implied actual authority in the context of hospitals and patient care. <u>See Mueller v. Auker</u>, No. CV-04-399-S-BLW, 2006 WL 1006871, at *1 (D. Idaho Apr. 14, 2006) (stating that a "hospital could be vicariously liable under certain circumstances for the acts of its employees, or for the acts of its agents under theories of actual, implied, or apparent authority"); <u>Alar v. Mercy Mem'l Hosp.</u>, 208 Mich. App. 518, 528, 529 N.W.2d 318, 323 (1995)

(recognizing the viability of the theory of implied actual authority in regard to the actions of an independent contractor physician in claims against both the physician and the hospital)

Defendant argues that Bynum v. Magno, 125 F. Supp. 2d 1249 (D. Haw. 2000), somehow abrogated the theory of implied actual authority in the context of hospitals and patient care. Mem. in Supp. at 25-26. But that is not the case. In Bynum, the Hawai`i federal district court, nineteen years ago, merely adopted a test for determining apparent authority in the context of hospitals and patient care. 125 Supp. 2d at 1266. Defendant goes too far in asserting that Bynum holds that apparent authority is the only means by which a hospital may be liable for the actions of an independent contractor physician. The plaintiff in Bynum argued only that the hospital should be "liable on a theory of apparent or ostensible authority." Id. at 1264. The plaintiff simply did not assert the theory of implied actual authority, and the court therefore addressed the only theory of agency that was before it.

Tellingly, Defendant provides no citation for its assertion that "there is no such thing . . . in the context of hospitals and patient care as implied actual authority and there are no cases setting forth such a standard." Mem. in Supp. at 26. The fact remains that implied actual authority is a viable theory of agency and vicarious liability in Hawai`i, and that

there are no cases applying Hawai`i law—<u>Bynum</u> included—that say otherwise.

For the foregoing reasons, the Court finds that its instruction was not plain error, and that the jury was properly instructed on the theory of implied actual authority under Hawai`i law.  The Court finds it unnecessary to repeat its analysis finding that there was substantial evidence for the jury to conclude that Dr. Elliott was an agent of Defendant under the theory of implied actual authority.  <u>See</u> April 16, 2019 Order at 27–29.  Accordingly, Defendant is not entitled to a new trial on this basis.

## II. Motion to Amend the Judgment

Alluding that the Judgment rested on a manifest error of law, <u>see</u> <u>Allstate</u>, 634 F.3d at 1111, Defendant argues that, under HRS § 663-15.5, the judgment should be amended "to account for the settlement agreement between Plaintiff and the County of Kauai." Mem. in Supp. at 27.  HRS § 663–15.5 provides in relevant part:

> (a) A release, dismissal with or without prejudice, or a covenant not to sue or not to enforce a judgment that is given in good faith under subsection (b) to one or more joint tortfeasors, or to one or more co-obligors who are mutually subject to contribution rights shall: . . .
>
> (2) Reduce the claims against the other joint tortfeasor or co-obligor not released in the amount stipulated by the release,

> dismissal, or covenant, or in the amount of
> the consideration paid for it, whichever is
> greater . . . .

HRS § 663–15.5(a)(2).  HRS § 663–11 defines "joint tortfeasors"

as "two or more persons jointly or severally liable in tort for

the same injury to person or property[.]"  HRS § 663–11

(emphasis added).

The Court has reviewed the Motion for Determination of

Good Faith Settlement filed by former-Defendants County of

Kaua`i, Isaiah Sarsona, Sandy Wakumoto, and Darryl D. Perry (the

"County Defendants"), ECF No. 314; Defendant's Statement of No

Position regarding the Settlement Motion, ECF No. 318; and

Plaintiff's Memorandum Regarding the Settlement Motion, ECF No.

319.  Nowhere in the aforesaid documents did the Plaintiff,

Defendant, or the County Defendants contemplate that Defendant

and the County Defendants were joint tortfeasors for purposes of

HRS § 663–15.5.  The Court has also reviewed Magistrate Judge

Richard L. Puglisi's Findings and Recommendation to Grant Motion

for Determination of Good Faith Settlement ("F&R"), ECF No. 321,

and nowhere in the F&R did the Magistrate Judge find that

Defendant and the County Defendants were joint tortfeasors.

Addressing this issue for the first time, the Court

finds that the Defendant and the County Defendants were not

joint tortfeasors.  Another court in this district has noted

that "where a plaintiff's injuries are separable . . .

defendants are not jointly or severally liable for damages.
Durham v. Cty. of Maui, No. CIV. 08-00342 JMS, 2011 WL 2532468,
at *5 (D. Haw. June 23, 2011) (citation omitted).  On the other
hand, if defendants "acted concurrently to produce an
indivisible injury to the plaintiff, the defendants are joint
tortfeasors."  Id. (emphasis in original, internal quotation
marks omitted); see also Saranillio v. Silva, 78 Haw. 1, 13, 889
P.2d 685, 697 (1995).

Here, Plaintiff's claims against Defendant for
assault, battery, and IIED arose out of one event—Defendant,
through its agent Dr. Elliott and employee Nurse Johns,
injecting Plaintiff with Haldol.  The jury properly completed
the Verdict Form and awarded Plaintiff damages attributable to
Defendant, and the jury did not consider evidence at trial
concerning the County Defendants' actions when arriving at its
damages award.  The jury's damages award was based solely on
Plaintiff's claims against Defendant for assault, battery, and
IIED.  The County Defendants were not involved in the events
that took place at Wilcox Memorial Hospital (except for the KPD
officer that transported Plaintiff to Wilcox Memorial Hospital
and to Mahelona), and accordingly, the Court finds that the
County Defendants and Defendant did not act "concurrently to
produce an indivisible injury," Durham, 2011 WL 2532468, at *5,

and therefore the County Defendants and Defendant were not joint tortfeasors.

Moreover, the Hawai`i Supreme Court has held that "[a] party is liable within the meaning of section 663-11 if the injured person could have recovered damages in a direct action against that party, had the injured person chosen to pursue such an action." Gump v. Wal-Mart Stores, Inc., 93 Haw. 417, 422, 5 P.3d 407, 412 (2000). It is inconceivable to suggest that Plaintiff could have recovered damages from the County Defendants for the injuries he suffered when he was injected with Haldol at Wilcox Memorial Hospital.

Rather than analyze whether the County Defendants acted concurrently with Defendant to produce an indivisible injury, Defendant argues only that "Plaintiff consistently (until his opposition to Wilcox [Memorial Hospital]'s motion to amend [the judgment]) claimed that the County Defendants and Wilcox [Memorial Hospital] acted jointly or severally to cause him the same physical and psychological/emotional injuries." Reply at 17.

The Court has reviewed the Complaint, filed on June 6, 2015, ECF No. 1, and notes that the Complaint does not appear to seek to hold the various defendants jointly or severally

liable.[13/]  Plaintiff's Complaint describes three distinct series
of events.  First, the Complaint describes the course of events
leading up to and including the Kaua`i Police Department ("KPD")
officers going to Plaintiff's property, placing him in handcuffs
and shackles, and transporting him to Wilcox Memorial Hospital.
Compl. ¶¶ 20-50.  It appears that these events were the genesis
of Plaintiff's various constitutional claims under  46 U.S.C. §
1983 (e.g., claims for excessive force, search and seizure, due
process, and equal protection violations against the individual
defendants (Counts I and II); as well as various theories of
municipal liability (Counts II, III and IV)).  See Compl. ¶¶
111-128.

The Complaint next discusses Plaintiff's time at
Wilcox Memorial Hospital.  Compl. ¶¶ 51-80.  These allegations
are most obviously those that gave rise to Plaintiff's assault,
battery, and IIED claims against Defendant.  While at Wilcox
Memorial Hospital, the only allegations involving any of the
County Defendants concern KPD Officer Isaiah Sarsona's refusal
to loosen Plaintiff's handcuffs, Compl. ¶¶ 53-54, which is
completely unrelated to the Haldol injection.  The Complaint
also alleges that Officer Sarsona, along with other hospital
employees, held Plaintiff down when he was being injected—

_____

[13/] Indeed, neither the word "jointly" or "severally" appears in
the Complaint.

although these allegations were contradicted by the testimony of Nurse Johns.  Day 3 Tr. 21:4-12 (testifying that Plaintiff was injected in the left deltoid), 23:7-9 (testifying that Plaintiff did not need to be subdued for the injection).

The remaining allegations in the Complaint concern Plaintiff's interactions with various KPD officers during the time he was transported from Wilcox Memorial Hospital to Mahelona, along with interactions with KPD officers that occurred in the months following Plaintiff's discharge from Mahelona.  Compl. ¶¶ 81-110.

While the Complaint does not specify which claims are asserted against which defendants, it is clear that the jury tried Plaintiff's claims against Defendant for assault, battery, and IIED arising out of only those events that occurred at Wilcox Memorial Hospital, and that these claims are distinct from any related claims Plaintiff settled with the County Defendants.  For example, while Plaintiff may have suffered injuries due to the manner in which the KPD officers handcuffed and shackled him, or Officer Sarsona's alleged refusal to loosen Plaintiff's handcuffs; the jury, given Plaintiff's settlement with the County Defendants prior to trial, quite appropriately did not hear testimony about any such purported injuries. Moreover, any injuries Plaintiff may have received due to the County Defendants' actions are clearly divisible from those he

suffered due to the Haldol injection. Although Defendant asserts that Plaintiff, throughout the course of this lawsuit, argued that Defendant and the County Defendants were jointly and severally liable for Plaintiff's injuries, a review of the Complaint and the record indicates Defendant is simply incorrect.

Accordingly, the Court finds that Defendant and the County Defendants were not joint tortfeasors within the meaning of HRS § 663-11, and therefore Defendant is not entitled to an offset under HRS § 663-15.5. Because the Judgment does not rest on a manifest error of law or fact, amendment of the judgment is not appropriate and Defendant's motion to amend the judgment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for a New Trial and to Amend the Judgment is hereby DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, July 10, 2019.



_Alan C. Kay_
Alan C. Kay
Sr. United States District Judge

Raymond v. Wilcox Memorial Hospital, Civ. No. 15-00212 ACK-RLP, Order Denying Defendant Wilcox Memorial Hospital's Motion for a New Trial and to Amend the Judgment.