IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

_____

CAMERON RAYMOND,                  )
                                  )
                                  )
              Plaintiff,          )
v.                                ) Civ. No. 15-00212 ACK-WRP
                                  )
WILCOX MEMORIAL HOSPITAL,         )
                                  )
              Defendant.          )
_____)

**ORDER DENYING DEFENDANT WILCOX MEMORIAL HOSPITAL'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW**

For the reasons discussed below, the Court DENIES

Defendant Wilcox Memorial Hospital's Renewed Motion for Judgment

as a Matter of Law, ECF No. 483.

**BACKGROUND**

For purposes of this Order, the Court will not recount

this case's lengthy procedural and factual history beginning in

2015.  The Court only discusses those facts of specific

relevance to the issues that this Order addresses.  Detailed

procedural and factual discussions are available in the Court's

Order Denying Defendant Wilcox Memorial Hospital's Motion for

Judgment as a Matter of Law dated April 16, 2019.  See ECF No.

470.

A jury trial on Plaintiff Cameron Raymond's

("Plaintiff") claims against Defendant Wilcox Memorial Hospital

("Defendant") for assault, battery, and intentional infliction

of emotional distress ("IIED") took place on March 13–15 and 20–21, 2019. ECF Nos. 437, 438, 440, 455, and 456. On March 18, 2019, Defendant filed a Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a) (the "Rule 50(a) Motion). ECF No. 444. Plaintiff filed a Memorandum in Opposition to Defendant's Rule 50(a) Motion on March 19, 2019. The Court heard oral argument on the Rule 50(a) Motion on March 20, 2019, ECF No. 455, but declined to rule thereon until after the verdict had been rendered.

The jury deliberated on March 21 and 22, 2019, ECF Nos. 456 and 461, and returned a verdict in favor of Plaintiff on March 22, 2019. ECF Nos. 461 and 463. The jury found Defendant liable for assault, battery, and IIED, and awarded Plaintiff $722,600, comprising $297,600 in compensatory damages[1] and $425,000 in punitive damages. ECF No. 463. On April 16, 2019, the Court issued an Order Denying Defendant Wilcox Memorial Hospital's Motion for Judgment as a Matter of Law (the "April 16, 2019 Order"). ECF No. 470. Judgment was entered on that same date. ECF No. 471. The Court's April 16, 2019 Order is hereby incorporated herein in its entirety.

---

[1] The jury found that Plaintiff had suffered $22,000 in special damages and $350,000 in general damages, ECF No. 463 at 4, but also found that Plaintiff had failed to mitigate damages in the amount of $74,400. Id. at 7.

On May 14, 2019, Defendant filed the instant Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) (the "Rule 50(b) Motion"), ECF No. 483, together with a Memorandum in Support ("Mem. in Supp.") thereof.[2/] ECF No. 483-1. On May 28, 2019, Plaintiff filed a Memorandum in Opposition ("Mem. in Opp."), ECF No. 487, and on June 13, 2019, Defendant filed its Reply. ECF No. 489. Under the Local Rules of Practice for the United States District Court for the District of Hawai`i, motions for judgment as a matter of law are non-hearing motions, and the Court finds that a hearing on this Motion is neither necessary nor appropriate. See L.R. 7.2(e).

## STANDARD

A district court ruling on a motion for judgment as a matter of law "may not substitute its view of the evidence for that of the jury," Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001), and must uphold the jury's verdict if it is supported by substantial evidence. See Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007) (citing Johnson, 251 F.3d at 1227). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it

---

[2/] Also on May 14, 2019, Defendant filed a Motion for a New Trial and to Amend the Judgment. ECF No. 481. That motion is addressed in a separate order.

is also possible to draw a contrary conclusion from the same evidence." Johnson, 251 F.3d at 1227. A district court ruling on a motion for judgment as a matter of law should review the record as a whole, but must disregard all evidence favorable to the moving party that the jury is not required to believe. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) ("That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." (citation and internal quotations marks omitted))).

In ruling on such a motion, the court must not weigh the evidence or make credibility determinations, Reeves, 530 U.S. at 150, "but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion," Wallace, 479 F.3d at 624 (citing Johnson, 251 F.3d at 1227–28). "The evidence must be viewed in the light most favorable to the nonmoving party, and all inferences must be drawn in favor of that party." Id.; see also Reeves, 530 U.S. at 150 (noting that the standard for judgment as a matter of law mirrors that for summary judgment). "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's

verdict." <u>Wallace</u>, 479 F.3d at 624 (citing <u>McLean v. Runyon</u>, 222 F.3d 1150, 1153 (9th Cir. 2000)). The "high hurdle" the moving party must clear in order to obtain relief "recognizes that credibility, inferences, and factfinding are the province of the jury, not [the] court." <u>Costa v. Desert Palace, Inc.</u>, 299 F.3d 838, 859 (9th Cir. 2002).

## DISCUSSION

I.      **Preliminary Matters**

   A. **Conversion of Defendant's Rule 50(a) Motion to a Rule 50(b) Motion**

        As the Court stated in its April 16, 2019 Order, rather than ruling immediately on a motion for judgment as a matter of law made before the case is submitted to the jury, a district court may, under Federal Rule of Civil Procedure 50(b), "defer its ruling and make a later determination of the legal questions raised by the motion . . . . The Court's deferred consideration effectively converts the motion into a post-verdict Rule 50(b) motion." <u>Merino v. Marchon, Inc.</u>, No. 92 4662 WDK (JRX), 1994 WL 695826, at *4 (citing <u>Biodex v. Loredan Biomedical</u>, 946 F.2d 850, 861 (Fed. Cir. 1991)); <u>see also</u> <u>Runnings v. Ford Motor Co.</u>, 461 F.2d 1145, 1148 n.4 (9th Cir. 1972) (noting the "desirability of withholding action on motions for directed verdicts and permitting the jury to reach a verdict"); <u>Krechman v. Cty. of Riverside</u>, 723 F.3d 1104, 1110

(9th Cir. 2013) (iterating that "taking a motion under submission and ruling on it after the jury returns a verdict is a proper practice"); Fed. R. Civ. P. 50(b) Advisory Committee's Note to 1991 Amendment (citing the potential for a movant's verdict mooting the motion, and for a reversal on appeal requiring a new trial, as reasons that "a court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence").

As another district court put it, "the ruling by the district court on the deferred Rule 50 motion, whether by grant or denial, will have the same legal consequence of a ruling by the district court on a post-verdict motion originally brought under Rule 50(b). Because a Rule 50(b) motion is nothing more than a renewal of the earlier motion, it cannot assert a ground that was not included in the earlier motion." Op Art, Inc. v. B.I.G. Wholesalers, Inc., Civil Action NO. 3:03-CV-0887-P, 2006 WL 3347911, at *1 (N.D. Tex. Nov. 17, 2006) (citing C. Wright & A. Miller, Federal Practice and Procedure § 2537 (2d ed. 1986); Morante v. Am. Gen. Fin. Ctr., 157 F.3d 1006, 1010 (5th Cir. 1998); Allied Bank-West, N.A. v. Stein, 996 F.2d 111, 115 (5th Cir. 1993)).

Plaintiff suggests that the Court, in its April 16, 2019 Order, "expressly converted [Defendant]'s Rule 50(a) pre-verdict motion into a post-verdict Rule 50(b) motion." Mem. in

Opp. at 2.  This suggestion mischaracterizes the Court's April 16, 2019 Order, which merely acknowledged that when a court defers ruling on a Rule 50(a) motion it effectively converts the motion into a Rule 50(b) motion; the Court did not expressly convert Defendant's Rule 50(a) Motion into a Rule 50(b) Motion. While conversion might appear a pragmatic approach, it is one the Ninth Circuit has never endorsed.[3/]  Moreover, Defendant is correct that litigants are required to move under Rule 50(b) within 28 days after the entry of judgment in order to preserve for appeal arguments made in a Rule 50(a) motion.  <u>See</u> Fed. R. Civ. P. 50(b); <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 546 U.S. 394, 404 (2006) (it is established "that the precise subject matter of a party's Rule 50(a) motion . . . cannot be appealed unless that motion is renewed pursuant to Rule 50(b)"). Accordingly, Defendant's Rule 50(b) Motion is properly before the Court; however, the motion raises significant waiver issues to which the Court now turns.

---

[3/] Other courts that have deferred ruling on a Rule 50(a) motion filed at the close of evidence have waited until the movant renewed its motion under Rule 50(b), denied the Rule 50(a) motion as moot, and ruled on the merits of the Rule 50(b) motion.  <u>See, e.g.</u>, <u>A.H. Lundberg Assocs., Inc. v. TSI, INC.</u>, CASE NO. C14-1160JLR, 2016 WL 5477525, at *2–3 (W.D. Wash. Sept. 29, 2016); <u>Asahi Glass Co. v. Guardian Indus. Corp.</u>, 886 F. Supp. 2d 369, 378 n.6 (D. Del. 2012); <u>Rose v. Barrett Twp.</u>, No. 3:09-CV-01561, 2014 WL 2039621, at *6 (M.D. Pa. May 9, 2014).

## B. The New Arguments Raised in Defendant's Rule 50(b) Motion Are Waived

The Ninth Circuit has stated the following about the interplay between Rule 50(a) and Rule 50(b):

> A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.

E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (citations and internal quotation marks omitted); OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., 897 F.3d 1008, 1016 (9th Cir. 2018) ("a party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion . . . . Such arguments are also waived for purposes of appeal.") (citations omitted). The Advisory Committee's Note to the 2006 Amendment to Rule 50(b) emphasizes that "[b]ecause the Rule 50(b) motion is only a renewal of the pre-verdict motion,

it can be granted only on grounds advanced in the pre-verdict motion."

When ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, courts are limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice. Go Daddy Software, Inc., 581 F.3d at 961 (citing Janes v. Wal-Mart Stores, Inc., 279 F.3d 883, 888 (9th Cir. 2002)). "This exception . . . permits only extraordinarily deferential review that is limited to whether there was any evidence to support the jury's verdict." Id. at 962-63 (internal quotation marks omitted, emphasis in original).

In Go Daddy, the Ninth Circuit determined that an argument first asserted in a movant's Rule 50(b) motion was the "logical extension" of an argument asserted in the movant's Rule 50(a) motion, and therefore the new argument was not waived. See 581 F.3d at 962; see also Coach, Inc. v. Celco Customs Servs. Co., CASE NO. CV 11-10787 MMM (FMOx), 2014 WL 12573411, at *6 (C.D. Cal. June 5, 2014). However, the Ninth Circuit did not broadly rule that new arguments raised in Rule 50(b) motions are proper where those arguments are logical extensions of arguments raised in Rule 50(a) motions. Nor did the Ninth Circuit develop any sort of standard for courts to apply in this regard, and it appears no other circuits apply a logical

extension analysis when determining whether a party has waived a
new argument raised in a Rule 50(b) motion.

Go Daddy involved a plaintiff who allegedly reported
to a human resources manager that two of his supervisors made
discriminatory comments about him.  581 F.3d at 955, 957.  The
plaintiff was later terminated by a panel that included as a
member the human resources manager to whom the plaintiff
complained.  Id. at 957, 959.  The plaintiff filed suit,
alleging discrimination and retaliation claims; the jury
returned a plaintiff's verdict on the retaliation claim.  Id. at
959-60.  The court considered a Rule 50(b) argument that the
plaintiff's alleged reports to the manager could not have
motivated the panel's termination decision, and the court
determined that this was a logical extension of the defendant's
sole Rule 50(a) argument that there was insufficient evidence
the manager told her fellow panel members of the plaintiff's
reports.  Id. at 962-63.  The Ninth Circuit's analysis suggests
that one argument is the logical extension of another if the
arguments are highly interrelated.  Indeed, the argument that
the plaintiff's alleged reports to a manager could not have
motivated the panel's termination decision is dependent upon the
related argument that the manager did not tell her fellow panel
members about the plaintiff's alleged reports.

The defendant raised two other Rule 50(b) arguments: (1) there was insufficient evidence for the jury to conclude that the plaintiff engaged in protected activity; and (2) if there was sufficient evidence for the jury to conclude that the plaintiff engaged in protected activity, there was insufficient evidence that the panel decided to terminate the plaintiff after he engaged in protected activity. Id. at 963. The court determined that these arguments were not logical extensions of the defendant's sole Rule 50(a) argument and were therefore subject to review for plain error.

Based upon the foregoing, the Court finds it appropriate to construe the logical extension "exception" to Rule 50(b) waiver narrowly. In the Ninth Circuit, "substantial compliance [with Rule 50] is not enough." Janes, 279 F.3d at 887. The Court now turns to the arguments that Defendant raises for the first time in its Rule 50(b) Motion.[4/]

### i. Expert Testimony

Defendant argues that Plaintiff's claims were "medical torts" within the meaning of Hawai`i Revised Statutes ("HRS") §

---

[4/] To the extent Defendant asserts that the arguments raised for the first time in its Rule 50(b) Motion were made in its Trial Brief, ECF No. 377, Reply at 2, and are therefore not waived, the Ninth Circuit has expressly rejected such arguments. See Janes, 279 F.3d at 887 (rejecting the defendant's argument that its trial brief satisfied the requirements of Rule 50 because "substantial compliance is not enough.").

671-1, and therefore Plaintiff's failure to present expert testimony that Dr. Chris Elliott's administration of Haldol departed from the relevant standard of care entitles Defendant to judgment as a matter of law. Mem. in Supp. at 6-7. In its Rule 50(a) Motion, Defendant argued that Plaintiff was required to present expert testimony in order to establish the causation elements of his claims—that is, that Haldol caused Plaintiff injuries and damages. The Rule 50(b) argument suggests that Plaintiff was required to adduce expert testimony concerning Dr. Elliott's decision to administer Haldol, while Defendant argued under Rule 50(a) that the causative effects of Haldol required expert testimony. The arguments are completely unrelated and the former is not a logical extension of the latter. Accordingly, the Court finds that this argument is waived.

### ii. Agency Arguments

Defendant's Rule 50(b) Motion argues that the implied actual authority theory of agency does not exist in the context of hospitals and patient care. Mem. in Supp. at 10. Defendant's Rule 50(a) Motion argued only that Dr. Elliott was not an agent of Wilcox Memorial Hospital under the theory of apparent authority. It is likely that Defendant's argument about implied actual authority is in fact a direct response to the Court having found, in its April 16, 2019 Order, substantial evidence for the jury to conclude that Dr. Elliott was an agent

of Wilcox Memorial Hospital under implied actual authority. The Court finds that this argument is not a logical extension of Defendant's argument regarding apparent authority because the arguments concern two different theories of agency law. Accordingly, this argument is waived.[5]

Relatedly, Defendant's argument that there is insufficient evidence to establish that Dr. Elliott was an agent of Defendant based on implied actual authority, Mem. in Supp. at 10-12, is also waived because no such argument was raised in Defendant's Rule 50(b) Motion.

Finally, Defendant argues that Dr. Elliott was not an agent of Defendant under the theory of apparent authority. Mem. in Supp. at 12-16. This argument was raised in Defendant's Rule 50(a) Motion, so the argument is properly before the Court.

_____

[5] The Court notes that this argument was also waived due to Defendant's failure to properly object to the Court's jury instruction on implied actual authority, see Day 5 Tr. at 1314-25, 14:1-7 (Jury Instruction No. 16), under Federal Rule of Civil Procedure 51(c). See Fed. R. Civ. P. 51(c). As the Court notes in its Order Denying Defendant's Motion for a New Trial and to Amend the Judgment, Defendant's objection to Jury Instruction No. 16 did not alert the Court "to the precise nature of the alleged error" in that jury instruction, Voohries-Larson v. Cessna Aircraft Co., 241 F.3d 707, 714 (9th Cir. 2001); see April 16, 2019 Order at 41-44, and Defendant thus waived its objection. Nevertheless, in its Order Denying Defendant's Motion for a New Trial and to Amend the Judgment, the Court discusses that even if this argument was not waived, it is meritless. See April 16, 2019 Order at 44-47. The Court declines to repeat that analysis here.

### iii.   IIED

Defendant raises two arguments in its Rule 50(b) Motion concerning Plaintiff's IIED claim.  First, Defendant argues that Plaintiff was required to present expert testimony to establish that Dr. Elliott's administration of Haldol was a departure from the relevant standard of care or an improper exercise of his medical judgment.  Mem. in Supp. at 17.  This argument is waived because it was not raised in Defendant's Rule 50(a) Motion.

Second, Defendant argues that Plaintiff failed to prove the elements of his IIED claim and, in making this argument, focuses on the conduct of Nurse Johns.  Mem. in Supp. at 18–19.  Defendant made this same argument in its Rule 50(a) Motion, so the argument is properly before the Court.

### iv.   Causation

Defendant's Rule 50(b) Motion argues that Plaintiff failed to prove the causation element of each of his claims because he did not present expert testimony regarding the causative effects of Haldol.  Mem. in Supp. at 20.  This argument was raised in Defendant's Rule 50(a) Motion, and it is therefore properly before the Court.

### v.   Punitive Damages

Defendant raises two arguments in its Rule 50(b) Motion concerning punitive damages.  First, Defendant argues

that Plaintiff failed to prove his entitlement to punitive damages based upon Dr. Elliott's conduct.  Mem. in Supp. at 24–26.  Defendant's Rule 50(a) Motion raised a similar argument, but only focused on the conduct of Nurse Johns.  Nevertheless, when the Court heard oral argument on Defendant's Rule 50(a) Motion, Defendant included arguments related to the conduct of both Dr. Elliott and Nurse Johns.  <u>See</u> Day 4 Tr. at 79:22–25, 80:1–23.  Accordingly, Defendant's argument that Plaintiff did not meet his burden of proof on punitive damages is properly before the Court.

Second, Defendant argues in its Rule 50(b) Motion that an award of punitive damages is improper because there is no evidence that Defendant, as principal, approved, authorized, or ratified the conduct of Dr. Elliott, Defendant's agent.  Mem. in Supp. at 27–29.  Nothing resembling this argument appears in Defendant's Rule 50(a) Motion, so the argument is thus waived.

## II.    Defendant's Rule 50(b) Motion

Notwithstanding that many of Defendant's arguments are waived, the Court finds, for the reasons discussed below, that none of the arguments asserted in Defendant's Rule 50(b) Motion have merit.

**A. Plaintiff's Failure to Present Expert Testimony Does
Not Entitle Defendant to Judgment as a Matter of Law**

Defendant argues that in order to prevail on any of his claims, Plaintiff was required to adduce expert testimony that Dr. Elliott's administration of Haldol was an improper exercise of medical judgment. Mem. in Supp. at 5. In effect, Defendant argues that Plaintiff's claims were "medical torts" under HRS § 671-1, and to prevail, Plaintiff was required to adduce expert testimony that Dr. Elliott's conduct was a departure from the relevant standard of care. Mem. in Supp. at 6-9. The Court addressed related arguments at length in its April 16, 2019 Order. See April 16, 2019 Order at 32-37 (rejecting Defendant's argument that expert testimony was required to prove the causation elements of Plaintiff's assault and battery claims), 45-48 (rejecting Defendant's argument that expert testimony was required to prove the causation element of Plaintiff's IIED claim).

Hawai`i law defines "medical tort" as "professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient." Haw. Rev. Stat. § 671-1(2). The Hawai`i Supreme Court has stated that HRS § 671 was enacted principally for purposes of stabilizing the medical

malpractice insurance industry in Hawai`i.  See Doe v. City and
Cty. of Honolulu, 93 Haw. 490, 497-98, 6 P.3d 362, 369-70 (2000)
(citation omitted).  Doe and Dubin v. Wakuzawa, 89 Haw. 188, 970
P.2d 496 (1998), two cases cited by Defendant, Mem. in Supp. at
6-8, concern the question of what sorts of claims constitute
medical torts and, therefore, must be submitted to the Medical
Claim Conciliation Panel as a precondition to bringing medical
tort claims in state court.  See Doe, 93 Haw. at 498, 6 P.3d at
370; Dubin, 89 Haw. at 194-95, 970 P.2d at 502-03.

        While Defendant is correct that under Hawai`i law a
medical tort can include "intentional acts and negligent acts
and acts for proper purposes and acts for improper purposes,"
Doe, 93 Haw. at 499, 6 P.3d at 371, Doe and the related cases
cited by Defendant do not hold that expert testimony concerning
the standard of care is required whenever a Plaintiff asserts
medical tort claims.  Nor do they hold, relatedly, that expert
testimony is required to establish that a medical practitioner's
conduct was an improper exercise of medical judgment.

        Defendant cites several Hawai`i cases for the
proposition that a plaintiff alleging a medical tort must
establish that the defendant's conduct departed from "the proper
standards of professional practice," Mem. in Supp. at 8, but
these cases are inapposite because they did not involve
intentional torts.  See Barbee v. Queen's Med. Ctr., 119 Haw.

136, 159, 194 P.3d 1098, 1121 (Ct. App. 2008) (medical negligence claims generally require expert testimony establishing the standard of care and causation); Bernard v. Char, 79 Haw. 371, 377, 903 P.2d 676, 682 (Ct. App. 1995) (same); Craft v. Peebles, 78 Haw. 287, 298, 893 P.2d 138, 149 (1995) (same).  Consistent with Hawai`i's medical negligence case law, the Court found that Defendant was entitled to summary judgment on Plaintiff's medical negligence claim due to his failure to disclose an expert witness by the disclosure deadline.  See ECF No. 164 at 42–46.  In short, Defendant has not identified, nor is the Court aware of, any case applying Hawai`i law that has required a plaintiff to adduce expert testimony in order to prevail on assault, battery, or IIED claims arising in a medical setting.

Accordingly, the Court will address the case law from other jurisdictions that Defendant has suggested should apply here.  Defendant offers Phillips v. Fairview Health Servs., Civil No. 10-4442, 2011 WL 6151514 (D. Minn. Dec. 12, 2011), Groomes v. USH of Timberlawn, Inc., 170 S.W.3d 802 (Tex. App. 2005), and Lucas v. Awaad, 299 Mich. App. 345, 830 N.W.2d 141 (2013).

In Phillips, the plaintiff asserted claims for false imprisonment, IIED, and battery arising out of his experience at a hospital.  2011 WL 6151514, at *1–2.  The crux of the

plaintiff's claims was that the hospital's decision to not immediately release him due to his suicidal ideations constituted false imprisonment and IIED, while the battery claim arose from a botched blood draw.  Id.  The court dismissed the claims, having determined they fell within a Minnesota statute that requires plaintiffs "alleging malpractice, error, mistake, or failure to cure . . . against a health care provider" to file with the court, within 60 days of serving the complaint, an affidavit stating that the plaintiff's attorney has reviewed the facts with an expert, and the expert is of the opinion that the defendant deviated from the standard of care and thereby caused the plaintiff's injury.  Id. at 2–3; see Minn. Stat. § 145.682. The court determined that the statute mandating expert testimony applied because the alleged mistreatment underpinning the plaintiff's claims arose out of the hospital employees' provision of medical services.  Id. at 2–3.  Unlike the Minnesota statute at issue in Phillips, Chapter 671 of the Hawai`i Revised Statutes, titled "Medical Torts," does not feature any expert testimony requirements.  Thus, even if the Court were to determine that Plaintiff's intentional tort claims were medical torts as defined in HRS § 671-1(2), no Hawai`i case or statute mandates that a Plaintiff adduce expert testimony to prevail on intentional medical tort claims.  Although Hawai`i law requires expert testimony to establish the standard of care

and causation for medical negligence claims, Craft, 78 Haw. at 298, 893 P.2d at 149, Hawai`i law does not require expert testimony for intentional torts involving the practice of medicine.  While the Court dismissed Plaintiff's medical negligence claim due to his failure to disclose an expert witness by the deadline, see ECF No. 164 at 42–46, at issue here are intentional tort claims.

Groomes is similarly inapplicable.  In Groomes, the court was tasked with determining whether false imprisonment and IIED claims were "health care liability claims" within the meaning of the Texas Medical Liability and Insurance Improvement Act, a statute that requires plaintiffs to provide defendants with expert reports within 180 days of filing a lawsuit alleging health care liability claims.  170 S.W.3d at 805; also Tex. Civ. Prac. & Rem. § 74.351.  The court ruled that the plaintiff could not "avoid the requirements of the [statute] by recasting her claims as non-medical negligence claims."  Id. at 806.  The instant case is distinguishable because Plaintiff asserted intentional tort claims, not medical negligence claims.  As the Court already noted, Plaintiff's failure to disclose an expert witness by the disclosure deadline barred his medical negligence claim.  See ECF No. 164 at 42–46.  Thus the Court reiterates that even if it were to determine that Plaintiff's claims were medical torts within the meaning of HRS § 671-1(2), Hawai`i law

simply does not require a Plaintiff to adduce expert testimony to prove intentional medical torts.

Lucas involved a doctor who the plaintiff alleged had intentionally misdiagnosed her children with epilepsy/seizure disorder for purposes of financial gain. 830 N.W.2d at 151. The plaintiff sued for IIED. Id. The court ruled that the plaintiff's claim was, in fact, a medical malpractice claim, because in order to prevail she "would necessarily have to establish that her children did not suffer from epilepsy/seizure disorder," which would "necessarily require expert testimony involving issues of medical judgment[.]" Id. at 151. Nothing in Lucas suggests that all IIED claims involving medical settings require expert testimony.

For the foregoing reasons, the Court finds that none of the aforementioned cases apply here because the expert testimony requirements in those cases were either mandated by statute or well-settled case law. Hawai`i has no similar statutory requirements, and Defendant has not identified, nor is the Court aware of, any Hawai`i case that requires a plaintiff to adduce expert testimony for claims of assault, battery, or IIED arising from the practice of medicine. Accordingly, the Court finds that Defendant is not entitled to judgment as a matter of law due to Plaintiff's failure to adduce expert testimony regarding Dr. Elliott's administration of Haldol.

Defendant next argues that even if expert testimony was not required, Plaintiff failed to proffer sufficient evidence at trial to establish that Dr. Elliott's administration of Haldol was not medically necessary for his safe transport to Mahelona within the meaning of HRS § 334-59(a)(3).[6/] Mem. in Supp. at 10.

The Court reiterates that there is substantial and clear and convincing evidence to support the jury's conclusion, see Verdict Form Question No. 4, ECF No. 463, that the administration of Haldol was not medically necessary for Plaintiff's safe transportation to Mahelona. The Court first

---

[6/] HRS § 334-59 provides, in subsection (a), three ways by which emergency admission to a licensed psychiatric facility may be initiated. The relevant provision of the statute states:

> Any licensed physician, advanced practice registered nurse, physician assistant, or psychologist who has examined a person and has reason to believe the person is:
>> (A) Mentally ill or suffering from substance abuse;
>> (B) Imminently dangerous to self or others; and
>> (C) In need of care or treatment;
> May direct transportation, by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A licensed physician, an advanced practice registered nurse, or physician assistant may administer treatment as is medically necessary, for the person's safe transportation. A licensed psychologist may administer treatment as is psychologically necessary.

HRS § 334-59(a)(3).

- 22 -

notes that because neither party designated any expert witness (medical or otherwise), the informative testimony available to the jury was necessarily limited in scope. Moreover, Defendant bore the burden of proof to establish this affirmative defense with evidence sufficient to demonstrate that the administration of Haldol was medically necessary for Plaintiff's safe transportation to Mahelona.

To that end, Dr. Elliott testified in support of his decision to administer both Geodon and Haldol, stating that he "felt it was necessary" to administer both medications for the 15- to 25-minute, nine-mile car ride from Wilcox Memorial Hospital to Mahelona. Day 1 Tr. at 79:7–17.

But the jury also heard evidence to the contrary. Specifically, psychiatric social worker Madeline Hiraga-Nuccio testified that Judge Edmund Acoba's order did not specifically authorize Defendant to administer medication to Plaintiff, Day 3 Tr. at 74:16–20, 76:11–15; however, Dr. Elliott was authorized to administer treatment under HRS § 334–59(a)(3), but only but only such "treatment as is medically necessary" for Plaintiff's "safe transportation" to Mahelona. Haw. Rev. Stat. § 334–59(a)(3). Nurse Dallen Johns testified that it was his understanding that the Haldol "wasn't for [Plaintiff's] safe transport and it was for his psychological stability." Day 3 Tr. at 43:23–25. Dr. Harold Goldberg testified that Plaintiff

was administered Geodon "primarily to calm him and sedate him and make him easier to transport[,]" while plaintiff was given Haldol "specifically for the psychotic-like things that he had been saying." Day 4 Tr. at 11–17. Dr. Goldberg also testified that he told Plaintiff the one hundred milligrams of Haldol administered by Dr. Elliott would remain in his system for thirty days, Day 4 Tr. at 16:11–13, 17:11–18, while Mahelona was only nine miles from Wilcox Memorial Hospital, and thus only a 15- to 25-minute drive. Day 4 Tr. at 11:21–25, 12:1. Finally, Dr. Goldberg testified that Mahelona is a "specialized facility" whose role was to address the "psychotic symptoms" Plaintiff was exhibiting. Day 4 Tr. at 72:15–25, 73: 1–7. Yet Dr. Elliott nevertheless instead chose to administer one hundred milligrams of Haldol for the same "psychotic symptoms" which were meant to be treated at the Mahelona psychiatric facility. Day 4 Tr. at 72:15–25, 73:1–2. Dr. Goldberg confirmed "those were the same symptoms that he was specifically being taken to Mahelona to address." Day 4 Tr. at 72:25, 73:1–2.

Based on the foregoing, the Court finds that there is substantial and clear and convincing evidence to support the jury's conclusion that Dr. Elliott's administration of one hundred milligrams of Haldol, which remained in Plaintiff's system for thirty days, Day 4 Tr. at 16:11–13, 17:11–18, was not medically necessary for Plaintiff's safe transportation to

Mahelona, and therefore did not come within the authority of HRS 334-59(a)(3).  Accordingly, Defendant is not entitled to judgment as a matter of law on this basis.

**B. There Is Substantial Evidence to Support a Finding that Dr. Elliott Was an Agent of Defendant**

Defendant argues that it is not liable for Dr. Elliott's administration of Haldol to Plaintiff because Dr. Elliott was not an agent of Wilcox Memorial Hospital.  Defendant asserts three related arguments.

**i.  Implied Actual Authority Applies and There Is Substantial Evidence to Support a Finding that Dr. Elliott Was an Agent of Defendant Under Implied Actual Authority**

Defendant argues that the implied actual authority theory of agency does not apply to patient care in hospital settings—implicitly arguing that the Court's jury instruction on implied actual authority was improper.  Mem. in Supp. at 10; see also Jury Instruction No. 16.  The Court rejects this argument in its Order Denying Defendant's Motion for a New Trial and to Amend the Judgment.

Therein, the Court disagreed with Defendant's argument that Bynum v. Magno, 125 F. Supp. 2d 1249 (D. Haw. 2000) abrogated the theory of implied actual authority in the context of hospitals and patient care.  In fact, Bynum merely adopted a test for determining apparent authority in the context of hospitals and patient care.  125 Supp. 2d at 1266.  The

plaintiff in Bynum did not argue that the hospital should be

liable for the acts of its independent contractor physicians

under the theory of implied actual authority, and the Bynum

court understandably did not address that theory of agency.

There are cases where other states have recognized the theory of

implied actual authority in the context of hospitals and patient

care.  See Mueller v. Auker, No. CV-04-300-S-BLW, 2006 WL

1006871, at *1 (D. Idaho Apr. 14, 2006); Alar v. Mercy Mem'l

Hosp., 208 Mich. App. 518, 528, 529 N.W.2d 318, 323 (1995).

Moreover, Hawai`i courts recognize the theory of implied actual

authority as a general matter.  See e.g., Cho Mark Oriental

Food, Ltd. v. K & K Intern., 73 Haw. 509, 515–16, 836 P.2d 1057,

1061–62 (1992); Haw. Rev. Civ. Jury Instr. 15.18 (Hawai`i model

civil jury instruction on implied actual authority).  The Court,

having found that implied actual authority is a perfectly valid

theory of agency and that Hawai`i law does not bar its

application in the context of hospitals and patient care,

declines to further address this issue at this time.

        Defendant next attacks the Court's finding in its

April 16, 2019 Order that there was substantial evidence for the

jury to conclude Dr. Elliott was an agent of Wilcox Memorial

Hospital under the theory of implied actual authority.[7/]  Mem. in Supp. at 11-12; see April 16, 2019 Order at 27-29.  Defendant has not provided any legal basis or authority to cause the Court to reverse its earlier ruling, so the Court declines to do so.  However, the Court reiterates the following: Dr. Elliott testified that his work at Wilcox Memorial Hospital involved "running [Defendant's] 20-bed emergency room with multiple things going on at one time," Day 1 Tr. at 9:4, 36:24-25, 35:1, 70:21-22; Day 3 Tr. at 30:5-8 (testimony of Nurse Johns), which included "very frequently" working with a psychiatric social worker to assess and treat patients pursuant to HRS § 334-59(a).  Day 1 Tr. at 67:12-25, 68:1-3.  Dr. Elliott also testified that nurses working at Wilcox Memorial Hospital took instruction from him when he practiced medicine there, and that he was responsible for overseeing Plaintiff's overall care and treatment while Plaintiff was at Wilcox Memorial Hospital.  Day 1 Tr. at 33:1-3, 39:21-23.  Moreover, Nurse Johns testified that Dr. Elliott had the authority to order and administer drugs

---

[7/] To determine whether an individual is an agent based upon implied actual authority, "the focus is on the agent's understanding of this authority inasmuch as the relevant inquiry is whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him to so act." Cho Mark Oriental, Ltd., 73 Haw. at 516, 836 P.2d at 1062 (citation and internal quotation marks omitted).

while he was practicing medicine at Wilcox Memorial Hospital, Day 3 Tr. at 30:9–13.

The foregoing indicates that Defendant acquiesced to Dr. Elliott's conduct on its behalf, and that Dr. Elliott reasonably believed Defendant desired him to undertake Plaintiff's treatment, which included ordering the administration of Haldol.

Additionally, evidence in the form of a letter dated January 27, 2014 from Kathy Clark, then President and CEO of Defendant, addressed to Plaintiff, indicates that Dr. Elliott acted within the scope of his authority as Defendant's agent when he ordered the administration of Haldol in the course of treating Plaintiff. See Defendant's Exhibit 30, ECF No. 487-9. The letter was "written in follow-up to complaints received regarding [Plaintiff's] Emergency Department visit of June 5, 2013." Id. Ms. Clark states that she had Plaintiff's medical record and care reviewed by Defendant's quality physician, and that "it is my determination that the care you received was appropriate, and we consider this matter closed." Id. Thus, having knowledge of the material facts, Defendant's then-President and CEO determined that Dr. Elliott's administration of one hundred milligrams of Haldol to Plaintiff was appropriate, which serves as evidence that Dr. Elliott acted within the scope of his authority as Defendant's agent.

There was thus substantial evidence in the record for the jury to conclude that Dr. Elliott acted as Defendant's agent under the theory of implied actual authority and that Dr. Elliott acted within the scope of his authority as Defendant's agent when he ordered Nurse Johns to inject Plaintiff with one hundred milligrams of Haldol.  Dr. Elliott's actions were thus binding on Defendant as principal and, accordingly, Defendant is not entitled to judgment as a matter of law on the issue of agency.

> **ii.  There Is Substantial Evidence to Support a Finding that Dr. Elliott Was an Agent of Defendant Under Apparent Authority**

Defendant also argues that there was insufficient evidence for the jury to conclude that Dr. Elliott acted as Defendant's agent under the apparent authority theory of agency. Mem. in Supp. at 12–16.  The jury was instructed on implied actual authority and apparent authority.  <u>See</u> Jury Instr. Nos. 16 and 17.  Thus, the Court, having concluded that there was substantial evidence for the jury to decide that Dr. Elliott was Defendant's agent under the theory of implied actual authority, need not reach Defendant's argument regarding apparent authority.  Nevertheless, the Court will briefly address apparent authority.

Hawai`i courts have never addressed the theory of apparent authority in the context of hospitals and patient care,

and the only related case is the nineteen-year-old Hawai`i
federal district court case <u>Bynum</u>, 125 F. Supp. 2d at 1249.  The
<u>Bynum</u> court stated that a "hospital may be liable for a
physician/independent contractor when he/she is cloaked in the
apparent authority of the hospital, <u>i.e.</u>, where the patient
reasonably believes that the doctor is an agent of the
hospital."  125 F. Supp. 2d at 1265.  The court considered cases
from other jurisdictions and adopted a test endorsed by courts
in Texas and Connecticut, which requires the plaintiff to prove
"that (1) he/she had a reasonable belief that the physician was
the agent/employee of the hospital, (2) the belief was generated
by some affirmative act of the hospital or physician, and (3)
the patient justifiably relied on the representation of
authority."  <u>Id.</u> (citing <u>Valdez v. Pasadena Healthcare Mgmt.</u>,
975 S.W.2d 43, 46–47 (Tex. App. 1998); <u>Menzie v. Windham Cmty.</u>
<u>Hosp.</u>, 774 F. Supp. 91, 97 (D. Conn. 1991)).

       Here, applying <u>Bynum</u>, there was substantial evidence
for the jury to conclude that Plaintiff had a reasonable belief
Dr. Elliott was an agent or employee of Defendant.  When
Plaintiff was brought to Wilcox Memorial Hospital, Plaintiff was
given a consent form, which he was required to sign, that
prominently featured the logo of Wilcox Memorial Hospital.  <u>See</u>
Def.'s Exh. 6, ECF No. 483-12.  The "Consent for Treatment"
section of the form states "I wish to receive medical care and

treatment at Wilcox Memorial Hospital. Accordingly, I consent to the procedures, which may be performed during this hospitalization or clinic visit, including emergency treatment. I authorize and consent to any of the following: . . . or other clinical and hospital service's [sic] as directed by my physicians(s) or my physician's(s) assistants. . . ." <u>Id.</u> The Court finds that this language suggests Wilcox Memorial Hospital and the physicians who work there are one and the same—the patient consents to treatment at Wilcox Memorial Hospital and whatever hospital services the physicians direct.

Moreover, Dr. Elliott never informed Plaintiff during his intake evaluation that he was not an employee of Wilcox Memorial Hospital. <u>See</u> Tr. Day 2 at 119:21-25, 120:1-25, 121:1-25, 122:1-12 (Plaintiff's testimony that he only saw Dr. Elliott on the night of the incident for five minutes and that the conversation consisted of Dr. Elliott asking Plaintiff questions regarding the events that took place earlier in the night). The Court finds that the recitation of the foregoing serves as substantial evidence for the jury to conclude Plaintiff had a reasonable belief that Dr. Elliott was an agent or employee of Defendant.[8/]

---

[8/] Although the "Financial Agreement" section of the consent form states that "I further understand not all physicians are employees of this medical facility," Def.'s Exh. 6, the Court (Continued...)

As for the second element of apparent authority under
Bynum, Plaintiff was given and required to sign the consent form
upon his arrival at Wilcox Memorial Hospital.  The Court finds
that this serves as substantial evidence of an affirmative act
of Defendant sufficient to generate Plaintiff's belief that Dr.
Elliott was an employee or agent of Wilcox Memorial Hospital.

Finally, on justifiable reliance, the Court finds that
by signing the form, Plaintiff justifiably relied on the
representations contained therein.  The jury may have determined
that by signing the consent form, Plaintiff justifiably relied
on Defendant's representations because he was to "receive
medical care and treatment at Wilcox Memorial Hospital."  Id.
(emphasis added).  Moreover, the only section of the form that
discusses physicians' relationships with Wilcox Memorial
Hospital contained a representation that "not all physicians are

_____

finds that this language implies that most physicians are, in
fact, physicians of Wilcox Memorial Hospital.  Moreover, this
language simply qualifies the sentence that precedes it: "The
physician(s) may bill me separately for their services provided
to me while at this facility."  Id.  In other words, the
language serves to inform patients that they might receive
separate bills from some doctors because some doctors are not
employees of the hospital.  It would be unreasonable to read the
language as implying all, or even most, physicians are not
employees, particularly where the language appears in a section
titled "Financial Agreement."  The language implies just the
opposite—that most physicians working at Wilcox Memorial
Hospital are employees of Defendant.  Accordingly, the Court
finds that this statement is insufficient to establish that
Plaintiff had notice that Dr. Elliott was not an agent or
employee of Defendant.

employees of this medical facility." Def.'s Exh. 6.  The Court

finds that this language indicates that most physicians are, in

fact, employees of Wilcox Memorial Hospital.  Cf. Fletcher v. S.

Peninsula Hosp., 71 P.3d 833, 841 (Alaska 2003) (finding that a

consent form that stated "I recognize that all physicians and

dentists who may be treating me are independent . . . and are

not employees or agents of the hospital" was sufficient action

by the hospital to dispel any appearance of employment, agency,

or authority).

        For the foregoing reasons, the Court finds that

substantial evidence was presented at trial such that the jury

could conclude that Dr. Elliott was an agent of Defendant under

the theory of apparent authority.  Indeed, judgment as a matter

of law may be granted only where "the evidence permits only one

reasonable conclusion, and that conclusion is contrary to the

jury's verdict."  Wallace, 479 F.3d at 624.  Here, the jury's

conclusion is consistent with the weight of the evidence.

Accordingly, Defendant is not entitled to judgment as a matter

of law on the issue of agency.

        The Court would reach the same conclusion even if

there was insufficient evidence for the jury to conclude that

Dr. Elliott was an agent of Defendant under the theory of

apparent authority.  As the Court noted, the jury was instructed

on implied actual authority and apparent authority, and there

was substantial evidence for the jury to conclude that Dr. Elliott was an agent of Defendant under the theory of implied actual authority.

### C. There Was Substantial and Clear and Convincing Evidence to Support a Finding of Liability for IIED

Defendant argues that Plaintiff was required to present expert testimony regarding the standard of care in order to prevail on his claim for IIED. Mem. in Supp. at 16–18. For the reasons discussed <u>supra</u>, this argument fails, and the Court will address it no further.

Defendant also reiterates its argument that it is entitled to judgment as a matter of law because there is insufficient evidence to establish the elements of IIED.[9/]  <u>Id.</u> at 18–20.  This argument fails for the same reasons the Court discussed in its April 16, 2019 Order, where the Court found there was substantial evidence for the jury to conclude that the elements of IIED were met.

The Court reiterates that the jury heard testimony that Dr. Elliott administered one hundred milligrams of Haldol, a long-acting antipsychotic, to Plaintiff, and that the Haldol would remain in Plaintiff's system for thirty days.  <u>See</u> Day 4

---

[9/] A plaintiff asserting a claim for IIED must establish "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress" to him.  <u>Hac v. Univ. of Hawai`i</u>, 102 Haw. 92, 106–07, 73 P.3d 46, 60–61 (2003).

Tr. at 16:11-13, 17:11-18 (Dr. Goldberg's testimony that he told Plaintiff the Haldol would remain in his system for thirty days).  Plaintiff testified that he did not consent to the administration of medication.  Day 1 Tr. at 131:18-19.  Dr. Goldberg further testified that he understood Plaintiff was administered Geodon in order to calm him down and effect his safe transport the nine miles from the emergency room of Wilcox Memorial Hospital to Mahelona, while Plaintiff was administered Haldol in order to address the very psychotic symptoms he was being taken to Mahelona, a specialized psychiatric facility, to address.  Day 4 Tr. at 72:15-25, 73:1-16; see also Day 1 Tr. at 79:7-9 (Dr. Elliott's testimony that Geodon is a short-acting alternative to Haldol).  Nurse Johns also testified that Plaintiff was given Haldol to address his psychological stability and not for the purpose of his safe transport to Mahelona.  Day 3 Tr. at 43:23-25.  Further, Dr. Goldberg testified that he wrote Plaintiff a "prescription for Haldol tablets, 10 milligrams, to be taken nightly for ten days," and that these ten milligram Haldol tablets were to help "wean him off" the one hundred milligram dose of Haldol Dr. Elliott administered.  Day 4 Tr. at 15:25, 16:1-2, 17:11-18.  Thus, although Defendant argues that Plaintiff failed to have an expert testify that one hundred milligrams of Haldol was too high of a dose, the jury heard Dr. Goldberg's testimony that the

Haldol would remain in Plaintiff's system for thirty days, and moreover, Dr. Goldberg gave him a lower dose of Haldol to help wean him off the heavy one hundred milligram dose he received from Dr. Elliott.

The jury heard testimony that Plaintiff was calm and non-combative while at Wilcox Memorial Hospital. See Day 1 Tr. at 41:12–21 (Dr. Elliott testifying that a nurse documented Plaintiff as being alert and appropriate, calm and cooperative, and oriented to person, time, place, and situation). Dr. Elliott in fact testified that after he examined Plaintiff, he was uncertain whether Plaintiff exhibited the bizarre behavior that prompted his arrival at Wilcox Memorial Hospital, and Dr. Elliott did not observe Plaintiff behaving bizarrely, behaving violently, or threatening anyone. Day 1 Tr. at 47:2–17.

Further, Nurse Johns testified that Plaintiff did not consent to the administration of Haldol, and in fact Nurse Johns conferred with Dr. Elliott about Plaintiff's refusal to receive medication. Day 3 Tr. at 40:14–25, 41:1–10. Although Nurse Johns testified that Plaintiff threatened him with a "magic sword," Nurse Johns further testified that he did not inform Dr. Elliott of this purported threat because it was not "relative to the situation"—Nurse Johns only informed Dr. Elliott of Plaintiff's refusal to receive medication. Day 3 Tr. at 31:1–11. Notwithstanding Plaintiff's refusal and his lack of

consent, Dr. Elliott told Nurse Johns that he was to "proceed with medication administration." Day 3 Tr. at 17:1-7

There was also substantial and clear and convincing evidence to support the jury's conclusion that the administration of Haldol was not medically necessary for Plaintiff's safe transportation to Mahelona. As the Court already noted, both Dr. Goldberg and Nurse Johns testified that Plaintiff was administered Geodon for the purpose of safely transporting him to Mahelona, while Plaintiff was administered Haldol for his psychological symptoms. Day 3 Tr. at 43:23-25 (testimony of Nurse Johns); Day 4 Tr. at 72:15-25, 73:1-16 (testimony of Dr. Goldberg).

Based upon the foregoing, the jury had substantial and clear and convincing evidence to support its conclusion that Defendant, acting through its agent Dr. Elliott and employee Nurse Johns, recklessly caused Plaintiff to be injected with 100 milligrams of Haldol, and that these actions were sufficiently outrageous for purposes of an IIED claim. As discussed below, there was also substantial and clear and convincing evidence for the jury to conclude that this conduct caused Plaintiff's injuries. Accordingly, Defendant is not entitled to judgment as a matter of law on Plaintiff's IIED claims.

### D. Expert Testimony Was Not Required to Establish the Causative Effects of Haldol

Yet again, Defendant argues that Plaintiff was required to present expert testimony to prevail on his claims, this time specifically arguing that expert testimony was required to establish that the administration of Haldol caused the injures Plaintiff suffered. Mem. in Supp. at 20–23.

The Court addressed this argument at length in its April 16, 2019 Order and rejected it. See April 16, 2019 Order at 32–37 (regarding causation for assault and battery), 45–48 (regarding causation for IIED). In short, the Court ruled (1) that Hawai`i law did not require Plaintiff to adduce expert testimony to prove the administration of Haldol caused Plaintiff's physical or emotional injuries; and (2) that Plaintiff adduced substantial evidence for the jury to conclude that Haldol caused Plaintiff's physical and emotional injuries. Indeed, Dr. Goldberg confirmed that he treated Plaintiff's "side effects from the Haldol for months." Day 4 Tr. at 72:11–14.

Defendant's Rule 50(b) Motion offers no new legal basis or authority to cause the Court to reverse its earlier ruling, and Defendant therefore is not entitled to judgment as a matter of law on the issue of causation.

**E. There Was Substantial and Clear and Convincing Evidence to Support the Jury's Award of Punitive Damages**

Defendant first argues that the jury's award of punitive damages was against the weight of the evidence because there was no evidence Dr. Elliott engaged in the type of conscious wrongdoing that warrants an award of punitive damages. Mem. in Supp. at 26. The Court rejected this argument in its April 16, 2019, and the Court also rejects this argument in its Order Denying Defendant's Motion for a New Trial and to Amend the Judgment, finding in both instances that the jury's punitive damages award was supported by substantial and clear and convincing evidence.

Defendant next argues that the jury's punitive damages award was improper because punitive damages are not permitted against a principal unless the principal approved, authorized, or ratified its agent's tortious conduct. The Court, having thoroughly analyzed and found that Defendant impliedly authorized, and expressly approved and ratified Dr. Elliott's conduct, rejects this argument in its Order Denying Defendant's Motion for a New Trial and to Amend the Judgment filed concurrently herewith, and declines to further address it herein. Moreover, the Court emphasizes that the letter dated January 27, 2014 from Ms. Clark, Defendant's then-President and CEO, serves as substantial and clear and convincing evidence for

the jury to conclude that Dr. Elliott acted within the scope of his authority as Defendant's agent when he ordered the administration of one hundred milligrams of Haldol.  Indeed, Ms. Clark had Plaintiff's care reviewed by Defendant's quality assurance physician and wrote "it is my determination that the care you received was appropriate."

Plaintiff has not presented any legal basis or authority to cause the Court to reverse its rulings as to punitive damages.  Accordingly, because the jury's punitive damages award was supported by substantial and clear and convincing evidence, Defendant is not entitled to judgment as a matter of law on the issue of punitive damages.

## CONCLUSION

For the foregoing reasons, Defendant's Renewed Motion for Judgment as a Matter of Law is hereby DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, July 10, 2019.



_Alan C. Kay_
Alan C. Kay
Sr. United States District Judge

Raymond v. Wilcox Memorial Hospital, Civ. No. 15-00212 ACK-WRP, Order Denying Defendant Wilcox Memorial Hospital's Renewed Motion for Judgment as a Matter of Law.